## Morris Unemployment Compensation Case.

Argued March 28, 1951. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*M. H. Goldstein,* for appellants.

*William L. Hammond,* Special Deputy Attorney General, with him *Charles J. Margiotti,* Attorney General, and *Roland M. Morgan,* Associate Counsel, for appellee.

*Joseph Brandschain,* with him *Wolf, Block, Schorr & Solis-Cohen,* for employer, intervenor, appellee.

OPINION BY RENO, J., September 26, 1951:

Appellants are members of Local No. 333 of the United Paper Converting Workers and Allied Trades Union, C. I. O., and were employed by Wolf Brothers, Inc., intervening appellee. Work stopped at the Wolf establishment on July 1, 1949. The Board held that the work stoppage was caused by a labor dispute, by a strike and not by a lock-out, and denied benefits. The facts differ from those present in *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 83 A. 2d 386, but the decision is governed by the legal principles announced in that case. The Board's decision will be affirmed.

A collective bargaining agreement between the parties was to expire at midnight of June 30, 1949. Negotiations for a contract began on April 30th and continued to June 30th, but no agreement was reached. On June 29th the Union's president prepared notices, which were posted in the plant either on that day or the next day, announcing that "unless a miracle occurs the strike will take place Friday morning July 1, 1949. All members are to report at 7:00 a.m. for picket duty."

At that time Wolf's plant was open; the workers' access to it was not barred, except by pickets; and the office personnel and 6 foremen reported for duty. A picket line was established; the pickets carried placards stating "Wolf Brothers on Strike, United Paper Workers of America Local No. 333, C. I. O.," and at the Union's Headquarters a sign was posted: "Wolf Brothers Strike Headquarters."[1] Notwithstanding the Board's findings of these facts, which findings are amply supported by competent and substantial evidence and have not been challenged, appellants still insist that the work stoppage, which they themselves denominated a strike, was caused by a lock-out.[2]

The contention is based upon incidents which occurred during the collective bargaining negotiations. In 1948 Wolf entered into an agreement with the Union, the terms and conditions of which were identical with

---

[1] In the record appears a reproduction of an article in the "C. I. O. Paper Workers News", the official publication of the Union, which refers to "The *strike* of members of Amalgamated Local 333, Philadelphia, against the Wolf Brothers Co. . . ." The article was not made the subject of a finding of fact.

[2] "In one sense a lockout is an employer's permanent discharge of his employees because of a labor controversy or because of his dislike of his employees' activities as a union. And in another sense a lockout exists where the employer closes his place of employment temporarily without formally discharging his employees, the object being to discourage union activities or to gain acceptance of his views or a compromise which is more favorable to him than the demands made by his employees. The foregoing are the more commonly accepted meanings of lockout; but labor often says that a lockout exists in cases where employees have struck to gain certain concessions and have offered to work on those conditions but the employer has refused to accept their labor on such terms. It would seem that labor uses the word in a third sense only for 'publicity purposes,' or to gain favor with those who dislike lockouts in the first two senses; otherwise there would be no purpose in calling the situation a lockout rather than a strike." 31 Am. Jur., Labor, §293.

those contained in the Union's agreements with two other Philadelphia paper establishments. In January 1949 the two companies agreed to new contracts "wherein an average ten cent [per hour?] increase in wages across the board was granted, as well as an additional week's vacation." The Union sought the same wage scale and terms from Wolf. At a negotiation meeting held on June 22nd, Wolf submitted a memorandum of "the reasons why it could not meet the increase requested and giving assurance that additional sales efforts would be made and its products offered competitively to customers, and if its efforts were successful and profits resulted from this intensified selling campaign, it would promptly reopen the wage question with the union and negotiate a wage increase consistent with the factors prevailing at that time."

Later, at a meeting on June 30th, "it was also proposed that the existing terms of the agreement be continued for fifteen days, or a longer period, so that negotiations might be continued and the employees continue at work even though the contract terminated as of midnight, June 30th, 1949. The proposal was rejected. The company was willing to renew the old contract for a full year with the additional promise that if they began to make profits, and if other industries granted wage increases, the company would be willing, the following December, to meet with the union again for the purpose of negotiating union proposals. Acceptance of this proposal would have resulted in a continuation of work. This was rejected by the Union."

The Board's ultimate finding is: "16. The unemployment of the claimants in question was due to a stoppage of work which existed because of a labor dispute between the company and the union of which these claimants were members." Its conclusion was: "In all work stoppage cases, the first question, therefore, must be whether the employes might, had they so

desired, have continued working under the existing terms and conditions of employment. If they have the opportunity to do so, but instead choose to suspend work with the view to improving their working conditions, the responsibility for their unemployment rests on them and the stoppage which ensues is not a 'lockout' within the meaning of the Law."

The conclusion is sound: "Responsibility" is used in the sense of "fault" within the meaning of the policy section of the Law, §3, 43 P.S. §752, and fault is assessed against the party whose actions constitute the *final cause* of the stoppage. Wolf did not withhold work; it did not bar access to its plant; work was available to the union members under the terms of the prior contract. Appellants ceased to work in order to gain a concession from Wolf or by reason of the expiration of the 1948 contract, and they and their fellow members called a strike. That was the final and effective cause of the work stoppage. As stated in the *Hogan* case, supra, the failure of the parties to agree, or Wolf's refusal to meet the Union's terms, or even Wolf's refusal to bargain collectively, do not impose liability upon the State's Unemployment Compensation Fund.

On May 20th (40 days before the strike commenced), Wolf declined the Union's proposal for arbitration. The prior contract contained no provision for arbitration, as in *Miller v. Johnstown Traction Co.*, 167 Pa. Superior Ct. 421, 74 A. 2d 508. The Union did not apply for arbitration under the Pennsylvania Labor Mediation Act of May 18, 1937, P. L. 674, 43 P.S. §211.31, et seq., and even if it had, "failure or refusal to arbitrate [would not] constitute a basis for any action at law or suit in equity." Id. §6, 43 P.S. §211.36. Even if the duty to bargain collectively and to submit disputes to arbitration be regarded as implied terms of employment, and are consequently contractual obligations, as appellant's able counsel plausi-

bly argues, breach of the obligations would be redressible in assumpsit, and not by the award of benefits out of the State's Unemployment Compensation Fund. *Glen Alden Coal Co. v. Unemployment Compensation Board of Review,* 168 Pa. Superior Ct. 534, 79 A. 2d 796. Moreover, a request and a refusal to arbitrate made 40 days before work ceases cannot constitute the *final cause* for the stoppage.

The Bureau's initial determination of eligibility to benefits was filed on August 4, 1949. Wolf appealed on August 9th, that is, within the ten day period prescribed by the Law, §501, 43 P.S. §821, but did not serve notice thereof upon appellants. The rules of the Board adopted pursuant to the Law, §505, 43 P.S. §825, do not require appellants to furnish notice of their appeals. A manual of instructions, issued by the Board, provides the procedure for the processing of appeals, and it lays the duty of giving notice of appeals upon the appeal clerks of the local offices. The failure of the clerk to give notice did not invalidate Wolf's appeal.[3]

Decision affirmed.

---

[3] For an interesting case where failure of an official to give notice did not prejudice an appeal, see *Nixon v. Nixon,* 329 Pa. 256, 198 A. 154.