Byerly Unemployment Compensation Case.

304

Argued April 16, 1952. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*M. Perlin,* with him *Maurice Louik, David Scribner, Arthur Kinoy* and *Harrison & Louik,* for claimants, appellants.

*William L. Hammond,* Special Deputy Attorney General, with him *Robert E. Woodside,* Attorney General, for Unemployment Compensation Board, appellee.

*J. G. Wayman,* with him *Job Taylor, II, Gilbert J. Helwig* and *Reed, Smith, Shaw & McClay,* for employer, intervening appellee.

OPINION BY DITHRICH, J., July 17, 1952:

Claimants, employes of the Westinghouse Electric Corporation at its Trafford Foundry Plant, were refused benefits under the Unemployment Compensation Law by the decision of the Bureau which was affirmed by the referee, whose decision was in turn affirmed by the Board of Review. Claimants were disqualified under §402 of the Law, as amended by the Act of May 23, 1949, P. L. 1738, §11, 43 PS §802, which provides, inter alia: "An employe shall be ineligible for compensation for any week . . . (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed: . . ." This appeal is a token appeal representative of 241 claimants.

Appellate review is performed by considering the testimony in the light most favorable to the party in whose favor the Board has found and if there is substantial competent evidence to sustain the findings of the Board they are binding upon us. *Stillman Unemployment Compensation Case,* 161 Pa. Superior Ct. 569, 56 A. 2d 380; *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 83 A. 2d 386.

In November, 1949, a collective bargaining agreement was in effect between the employer and the United Electrical, Radio & Machine Workers of America, hereinafter referred to as UE. The UE was the bargaining agent for the employes at the Trafford Foundry and was to continue as such until April 27, 1950, at which time an election was to be held by the National Labor Relations Board to determine whether the UE or a rival union, the International Union of Electrical

Workers, CIO, would act as bargaining agent after that date. All employes at the Trafford plant were eligible for membership in either union. The two unions and the employer agreed that the existing steward structure, set up to handle grievances, would continue until the NLRB election was held. Under the collective bargaining agreement all wages lost by a shop steward in the processing of grievances during working hours were to be paid in equal shares by the employer and the union.

The Trafford Foundry is made up of various departments, and the employes are assigned to various sections according to job classifications. Peter Mundsinger, employed in section TF-49, composed of cupola operators, was a subdivision union steward representing the employes in TF-49 and other sections. Because the employer refused to pay Mundsinger for time lost in processing a grievance, the workers in TF-49 stopped work on January 9, 1950. On January 10, Mundsinger was discharged for the reason that he allegedly had precipitated the work stoppage and threatened to damage company property. A grievance protesting the discharge was immediately filed, but after a hearing held the next day, with no resultant change in the employer's position, the men in TF-49, who had reported for work, walked off the job and did not return to work until February 8, 1950, at which time the employer was notified that Mundsinger's discharge grievance would be carried to the next grievance level. There is no evidence that any grievance was made, based on the employer's refusal to pay Mundsinger for lost time. Claimants, none of whom worked in section TF-49, were unemployed during the period of work stoppage in that section.

There can be no doubt that a stoppage of work existed because of a labor dispute as defined in *Curcio*

*Unemployment Compensation Case,* 165 Pa. Superior Ct. 385, 390, 391, 68 A. 2d 393, but claimants contend that the stoppage of work existed because of a lockout. It is argued that §402(b) of the Law makes it clear that the term "lock-out" in §402(d) includes the situation where "as a condition of continuing in employment" an employe would be required "to accept wages, hours or conditions of employment not desired by a majority of the employes in the establishment or the occupation, or would be denied the right of collective bargaining under generally prevailing conditions." It is further argued that since the rivalry between the unions produced confusion as to which union was the collective bargaining agent, the workers were forced to bargain on a group basis through individual shop stewards and, therefore, the company's refusal, in violation of its contractual obligation, to pay Mundsinger for time lost in handling a grievance created an intolerable situation wherein the workers, if they continued to work, would surrender "every vestige of their right to labor representation." In addition it is argued that the employer was aware that its action would result in work stoppage and fully intended that it do so.

Section 402(b) does not purport to define a lockout, nor can we regard it as controlling the meaning of that term. The concluding language of subsection (b) provides that "this subsection shall not apply in the event of a stoppage of work, which exists because of a labor dispute within the meaning of subsection (d)." The Legislature has restricted the application of subsection (b) to cases where there has been a "voluntary leaving," that is, a termination of the employment relationship,[1] and where the issue is whether the

---

[1] That a "voluntary leaving" imports a complete severance of the employment relationship, see *Schneider Unemployment Compensation Case,* 163 Pa. Superior Ct. 427, 62 A. 2d 99.

employe was motivated by "good cause." Subsection (b) has no application where the employment relationship is not severed, as in cases involving labor disputes.[2] That which constitutes "good cause" for a "voluntary leaving," as indicated in subsection (b), will not characterize a labor dispute as a lockout unless it is within the meaning of that term as defined independently of that subsection.

In *Hogan Unemployment Compensation Case,* supra, we said (pp. 560, 561) : " 'A strike is a concerted refusal by employees to do any work for their employer . . . until the object of the strike is attained, that is, until the employer grants the concession demanded:' Restatement, Torts, §797, Comment *a.* 'A lockout is an employer's *withholding of work* from his employees in order to gain a concession from them. It is the employer's counterpart of a strike . . .': Id., §787, Comment *a.* (Emphasis added.) A lock-out may be present in varying factual situations, and no definition can comprehend all its manifestations. The core of a lockout is the act of an employer in *withholding work,* which includes the physical closing of the place of employment, as in Burger Unemployment Compensation Case, 168 Pa. Superior Ct. 89, 77 A. 2d 737, but is not limited to the existence of that condition. An employer may impose a lock-out without physically closing his plant or without forbidding access to it by his employes. Barnes v. Hall, 285 Ky. 160, 146 S. W. 2d 929." In the *Barnes* case it was said (p. 178) : "Insistence on onerous terms by an employer, accompanied by a threat of dismissal if not accepted, might, under certain circumstances, constitute a 'lock-out.' "

---

[2] That a labor dispute does not sever the employer-employe relationship, see *Burger Unemployment Compensation Case,* 168 Pa. Superior Ct. 89, 77 A. 2d 737.

Mundsinger testified that he had been paid wages for time lost for every grievance investigation he made with the exception of the one involved in this case, namely, the investigation he made in processing the grievance of Henry Remic, a worker in TF-50, who was laid off December 16, 1949, allegedly "out of seniority." Payment was refused in that instance, according to the employer's testimony, for the reason that the grievance investigated was believed to have been beyond the scope of the authority of a subdivision steward. It appears to us that claimant's contention is an unwarranted exaggeration of the effect and significance of the employer's refusal to pay Mundsinger's claim. Under the circumstances, a deliberate denial of the right of labor representation cannot be inferred either from that act or from the employer's act in firing Mundsinger. Nor is there any other evidence to support such an inference. In our judgment, even when viewed most favorably to claimants, the employer's action can be held to be no more than the violation of contract claimants contend it was. Whether the employer was justified is of no moment. The salient fact is that the workers walked off the job because of a labor dispute rooted in an alleged breach of contract. This is not a case where an employer insists on onerous terms as a condition of continued employment amounting to a withholding of work. It is a case where employes have sought redress of an alleged contract violation by a concerted work stoppage. But contract violations are redressible in assumpsit and not by the award of benefits out of the State's Unemployment Compensation Fund. *Morris Unemployment Compensation Case*, 169 Pa. Superior Ct. 564, 569, 83 A. 2d 394. Moreover, Mundsinger's rights could have been tested by exhausting all remedies under the contractual provisions relating to the settlement of disputes. In *Miller*

*v. Unemployment Compensation Board of Review,* 152 Pa. Superior Ct. 315, 321, 31 A. 2d 740, this Court said: "The Unemployment Compensation Law was not intended to promote stoppages of work by employees because of disputes with employers or bargaining agencies, which could be legally determined without any cessation of work. The fundamental idea of the Act is to provide a reserve fund to be used for the benefit of persons *unemployed through no fault of their own."*

Claimants argue that the intention of the employer "to create a lockout situation" is evidenced by the fact that they and all other workers except those in TF-49 reported regularly for work, but although there was work for the majority of the foundry workers they were not tendered employment in either regular or alternate jobs.

The argument has no foundation in fact. The referee found as follows: "8. Activity in all sections, other than TF-30, Pattern Shop, . . . is dependent upon the operation of TF-49 as this section supplies the metal on which the other sections work. Therefore, cessation of operations in TF-49 ultimately results in a shut-down of the other sections. 9. . . . Because of the stoppage of work caused by the strike of the production workers in TF-49, metal was not available for the other sections of the Foundry and the claimants were temporarily unemployed which unemployment continued during the entire period of the strike of section TF-49." These findings, supported by substantial evidence and adopted by the Board, are binding upon us. *Stillman Unemployment Compensation Case,* supra, 161 Pa. Superior Ct. 569, 56 A. 2d 380. In addition the general foreman testified that if there were jobs to be done the men were called upon to do them. Claimants Ragan and Byerly were among those called upon. It should

also be noted that the pattern makers worked until the last week of the strike.

Under §402(d), although a claimant may be unemployed due to a stoppage of work which exists because of a labor dispute other than a lockout, he is entitled to compensation "if it is shown that (1) he is not participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (2) he is not a member of an organization which is participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (3) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in, or directly interested in, the dispute."

Claimants, however, were members of UE Local 601, an organization which, while it did not call the strike of TF-49, undoubtedly had a direct interest in the labor dispute, as evidenced by circulars issued by Porter Mechling, its president, urging the members to respond to the appeal of the foundry workers "for all out physical and financial support from every section of the Westinghouse plant" and to "Unite behind TF-49 and Pete Mundsinger."

There is ample evidence for the Board's additional finding that "Local 601 of the United Electrical, Radio & Machine Workers of America, encouraged support of the strike action taken by the cupola operators by issuing circulars urging moral and financial support of the strike."

Moreover, claimants belong to the same grade or class as the workers in TF-49. It was found that "While the duties of the various employes differ somewhat in detail, yet they were all hourly paid production workers [engaged] in the manufacture of electrical equip-

ment." Claimants point out that wages of the foundry workers were not based solely on an hourly rate but that some employes were paid according to group or individual incentive scales. However that may be, we are of opinion that the significant portion of the finding, which is supported by the evidence, is that the employes were production workers. Therefore claimants are within our decision in *Curcio Unemployment Compensation Case*, supra, pp. 391, 392.

Decision affirmed.