Arbechesky Unemployment Compensation Case.

218

Argued March 9, 1953; reargued September 30, 1953. Before RHODES, P. J., HIRT, RENO, ROSS, GUNTHER and WRIGHT, JJ.

*Sidney G. Handler,* with him *Douglass, Handler, Rosenberg & Ware,* for appellants.

*William L. Hammond,* Special Deputy Attorney General, with him *Robert E. Woodside,* Attorney General, for appellee.

OPINION BY HIRT, J., November 16, 1953:

During the period in question in this Unemployment Compensation Case, Carmeda Arbechesky, the present appellant, and 34 others were employed by Larksville Fashions, Inc., a manufacturer of ladies dresses. All of them were members of Local 249 of the International Ladies Garment Workers' Union. This employer in October 1950 became a member of the Pennsylvania Dress Manufacturers Association Inc., herein referred to as the Association. At that time there was a subsisting collective bargaining agreement between that Association and the Northeast Depart-

ment of the International Ladies' Garment Workers' Union. As a member of the Association the above employer was bound by the terms of the agreement, made on behalf of all existing and future members of the Association.

The Association on February 1, 1951, entered into a new collective bargaining agreement with the above Northeast Department which thereafter constituted the union-management contract between Larksville Fashions and Local 249 of the International Ladies' Garment Workers' Union. The seventh section of the agreement provided: "(a) Each Employer agrees to pay to the Union at the end of each payroll period a sum equivalent to seven (7%) per cent of its total gross payroll . . . for such period of all its employees covered by this agreement . . . towards the Union's Health and Welfare Fund, a trust fund established . . . and maintained by the Union in trust for the purpose of providing its members with health, welfare and recreation benefits and services." The thirty-third section of the agreement provided: "Any and all disputes, complaints, controversies, claims or grievances whatsoever between the Union or any of its members and the Association or any of its members, arising under, out of, or in connection with or in any manner relating to this agreement, shall be taken up for adjustment between the respective representatives of the Association and the Union. Should said representatives fail to agree, such disputes, complaints, controversies, claims or grievances shall be submitted to arbitration before the Impartial Chairman hereinafter named, or designated as hereinafter provided, as arbitrator, whose decision shall be final and binding."

After becoming a member of the Association, Larksville Fashions continued its practice of paying wages to its employes during vacation periods although va-

cation pay was not required by the terms of the above agreement between the Association and Northeast Department of the Union. The employer insisted that it was entitled to some credit for these vacation benefits against the payments into the Union's Health and Welfare Fund, stipulated in section Seventh(a) of the agreement. When the association indicated that the proposal was not acceptable to it Larksville Fashions refused to make any payments into the fund and also refused to submit the dispute to arbitration pursuant to the thirty-third section of the union-management contract, above quoted. Thereupon the district officers of the union determined to exert pressure on the employer to compel compliance with its obligation under the contract, by calling a temporary stoppage of work in the plant of the employer. Accordingly a representative of the local union on May 15, 1951, advised the employes of Larksville Fashions not to report for work on the following day. A stoppage of work resulted and continued for about $3\frac{1}{2}$ months and until August 30, 1951 when the union employes returned to work pending negotiations for a settlement of the dispute.

On May 24, 1951 appellant and her 34 co-workers registered for work. Their claims for benefits were declared invalid by the Bureau under Section 402(d) of the Unemployment Compensation Law, 43 PS §802. On successive appeals both the Referee and the Board of Review affirmed the Bureau.

Upon agreed facts the Board found: "10. Consistent with the decision to temporarily create a work stoppage officials of the District Union requested the Union Chairlady on May 15, 1951 to advise the employees not to report for work the day following. Those employees who were not contacted reported for work on May 16, 1951 but were advised by the Union Busi-

ness Agent as to the reason that other employees were not working and they were instructed to leave work at the noon hour. These employees, in compliance with the instructions given to them, left the employer's establishment and as a consequence operations of the plant were suspended. 11. Immediately prior to the stoppage of work by the employees, a shipment of approximately 800 dresses had arrived at the plant of the employer and work was available to the employees when the stoppage was created. 12. In addition to Larksville Fashions, Inc., the employer operated another plant, the Advance Juniors, in New York City and shortly after the work stoppage commenced at the former plant pickets were established around the premises of the latter plant and a stoppage of work was effected there also. There was, however, no relationship between the dispute at Larksville Fashions, Inc., and the dispute at Advance Juniors . . . . 13. No formal picket line was established at Larksville Fashions, Inc., but watchers were on hand in the immediate vicinity of the plant to discourage anyone from entering. Throughout the period here involved no work was performed in the employer's plant and the claimant, [and the other 34 employees] who had been advised not to work because the employer had violated the contract by not paying into the Health and Welfare Fund, did not report for work at any time."

The Board in the opinion in this case stated: "That the unemployment of the claimant had its inception in a strike of the employees at Larksville Fashions, Inc., is evident. That that strike occurred as a result of a labor dispute is likewise apparent." And the Board concluded that the work stoppage did not amount to a 'lockout' although the strike was precipitated by the failure of Larksville Fashions to make contributions to the Health and Welfare fund under a contract which

imposed that obligation upon it as a member of the Association. Accordingly, because the facts in this case did not bring it within the exception, as to a lock-out of Section 402(d) of the Unemployment Compensation Law, 43 PS §802, the Board refused benefits because of a labor dispute, within the intent of that section of the Act. Cf. *Byerly Unemploy. Compensation Case,* 171 Pa. Superior Ct. 303, 90 A. 2d 322.

In *Hogan Unempl. Compensation Case,* 169 Pa. Superior Ct. 554, 560, 83 A. 2d 386, we said through Judge RENO: "A lock-out may be present in varying factual situations, and no definition can comprehend all its manifestations. The core of a lock-out is the act of an employer in *withholding work,* which includes the physical closing of the place of employment, as in Burger Unemployment Compensation Case, 168 Pa. Superior Ct. 89, 77 A. 2d 737, but is not limited to the existence of that condition. An employer may impose a lock-out without physically closing his plant or without forbidding access to it by his employes. Barnes v. Hall, 285 Ky. 160, 146 S.W. 2d 929." But proof of a lockout in the present case, is not made out by evidence that the employer, as charged by the appellant and her co-employes, imposed terms of employment by refusing payments into the Welfare Fund, which it is alleged compelled them to work under less favorable conditions than those which the employer was bound to supply under its contractural obligation. "The Unemployment Compensation Law was not intended to promote stoppages of work by employees because of disputes with employers . . . which could be legally determined without any cessation of work . . . To call a suspension of work and act in concert to prevent a continuance of operations, without resorting to the legal measures open to determine the rights of the parties, amounts to a voluntary suspension of work,

with the necessary consequences provided in the Act": *Miller v. Unemp. Comp. Board,* 152 Pa. Superior Ct. 315, 31 A. 2d 740. On this principle the Board properly refused benefits in this case. There were adequate available legal measures open to appellant. The union had a remedy in an equity action to compel performance of its agreement with the employer, arising from the employer's membership in the Association. By mandatory decree in an action in equity arbitration of the dispute could have been imposed on the employer without stoppage of the work. Cf. *Jt. Bd. Waist & Drmkrs' Union v. Rosinsky,* 173 Pa. Superior Ct. 303, 306, 98 A. 2d 447. Moreover, these employes even under their theory of a lockout, had an available remedy in assumpsit for the amount of lost wages, under Section twenty-sixth of the contract, in the event the employer refused to resume operations on demand. Cf. *Morris Unempl. Compensation Case,* 169 Pa. Superior Ct. 564, 83 A. 2d 394; *Glen Alden Coal Co. v. Unempl. Comp. Bd.,* 168 Pa. Superior Ct. 534, 79 A. 2d 796.

The employer in this case had work for all of its employes and was ready and willing to continue operations of its plant. By acceding to the Union's request, appellant and her co-employes and not their employer must be charged with responsibility for the work stoppage.

Order affirmed.

Ross, J., dissents.