King Unemployment Compensation Case.

Crucible Steel Company of America, Appellant, *v.* Unemployment Compensation Board of Review.

630

Argued April 10, 1957. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*John G. Wayman,* with him *Leonard L. Scheinholtz,* and *Reed, Smith, Shaw & McClay,* for employer, appellant.

*Sydney Reuben,* Assistant Attorney General, with him *Thomas D. McBride,* Attorney General, for Unemployment Compensation Board of Review, appellee.

OPINION BY HIRT, J., June 11, 1957:

The claimant King registered for work and filed an application for benefits for the week ending January 19, 1955. His claim was denied by the bureau on the ground that the work stoppage was the result of an industrial dispute within §402(d) of the Unemployment Compensation Law, 43 PS §802. The referee reversed the bureau on the testimony of the claimant alone. One year later, after hearing the employer's witnesses, on a remand order of the board, the referee reinstated his original decision and order of April 14,

1955, awarding benefits as claimed. On the employer's appeal from that order the board made new findings but nevertheless affirmed the decision of the referee and allowed the claim credit.

Claimant King was a coal miner employed by the Crucible Steel Company at its deep coal mine at Crucible, Pennsylvania. He was also the chairman of Local No. 4731 of the United Mine Workers of America, which was the bargaining agent for the workmen in the mine. On January 10, 1955 two coal miners were assigned to work as cutters at a "place" in the mine known as "6-E Straight." The two men refused to cut the coal as directed by their boss because there was no "crib supporting the roof of the place. Their superior, an assistant foreman, referred their complaint to the mine foreman and also to the mine safety supervisor both of whom, when they visited the place, found it safe and they so advised the men. One of the two men, according to the testimony, admitted that the roof was safe but refused to work as directed saying that they would be fined by their union if they cut the place without a crib (which we understand to be a roof support built up of large solid blocks of wood). The men were then sent to the mine superintendent and when they persisted in the stand they had taken, they were discharged by him. The third coal miner, here involved, refused to operate a loading machine, the same day, saying that he would be fined by his union if he worked without a helper. The testimony is that a helper was not necessary on this loader and never had been supplied. This man was not discharged; he left the mine and was presumed to have quit. Shortly thereafter the other coal miners walked out and by mid-afternoon all had left their jobs in the mine. The 3:00 o'clock shift did not report for work. On the next day, January 11, 1955, the State Mine Inspector, *at*

*the request of the union,* investigated the complaint by inspecting the section of the mine in controversy. At the hearing in response to the question: "What condition did you find this place?" he answered: "I would say from a safety standpoint the place was in perfect condition" and that it did not require cribbing. The miners returned to work at 3:00 p.m. on January 11, the day of the inspection. The following day, January 12, the mine superintendent met with the three employees and he changed the record of their discharge to "two-week suspensions", following which, certain of the union officials conferred with the superintendent. No man reported for work on January 13. But at a meeting on January 22, the union officials asked the men to return to work under the terms of the Bituminous Wage Agreement and the State and the Federal law, so that the grievances, through the channels there provided, could be taken up with management. In accordance with a vote of the membership the men went back to work on January 24.

The basic finding of the board upon which it affirmed the decision of the referee is this: "8. At this same meeting [on January 12, 1955, referred to, supra] the superintendent also told the union officials that he wanted them to inform the men that he and the other supervisors would be the sole judges of safety in working places and any miner disregarding their opinions would be discharged immediately, regardless of what the miners thought about the safety of the place." But at the same time the board in its 11th finding recognized that "Mine Safety Laws place responsibility for safety law violations on both management and the employees involved." It is at once obvious in the disposition of this appeal that the alleged statement of the mine superintendent, even if made, would not convert the present work stoppage resulting from a labor

dispute, into a lock-out, under §402(d) supra, which would entitle all striking employees to unemployment benefits.

The statute law on the subject of safety in mines in Pennsylvania is contained in the Act of June 9, 1911, P. L. 756, as amended, 52 PS §701 et seq. The Federal Coal Mine Safety Act of May 7, 1941, as amended, 66 Stat. 710, 30 U.S.C.A. §§451-483 contains provisions similar to those of our State Act, including the inspection of coal mines by designated officials to obtain information relating to health and safety conditions in the mines. These statutes place the responsibility for the safety of a mine upon the mine superintendent and upon the foreman and all other persons under him. Even if the superintendent had made the statement attributed to him, his arrogation of authority could not have taken from the workmen any of the remedies provided by the above statutes. Moreover the Bituminous Wage Agreement which was in effect at all times was material to the case. Accordingly the effective contractual remedies therein provided were available to the union. This was admitted by a district official of the union who said: "We have the machinery to take that grievance up." The contract between the union and the employer in this instance bound them to comply with both the Federal law and the mining law of this State. The union, therefore, instead of ordering a work stoppage could have come into equity as an additional or alternate remedy to compel compliance with the safety or other provisions of its contract if any of said provisions allegedly had been violated. *Gen. Bldg. Contrs.' Assn. v. Local No. 542,* 370 Pa. 73, 87 A. 2d 250; *Arbechesky Unempl. Compensation Case,* 174 Pa. Superior Ct. 217, 223, 100 A. 2d 396; *Jt. Bd. Waist & Dressmaker's Union v. Rosinsky,* 173 Pa. Superior Ct. 303, 306, 98 A. 2d 447. Moreover the

men themselves if damaged by their discharge in breach of the safety provisions of the contract would have had their remedy in the courts. *Byerly v. Unemploy. Compensation Case,* 171 Pa. Superior Ct. 303, 90 A. 2d 322; *Morris Unempl. Compensation Case,* 169 Pa. Superior Ct. 564, 83 A. 2d 394. Accordingly the present case is decisively disposed of by the application of the rule thus stated in *Miller v. Unemp. Comp. Bd.,* 152 Pa. Superior Ct. 315, 31 A. 2d 740: "The Unemployment Compensation Law was not intended to promote stoppages of work by employees because of disputes with employers . . . which could be legally determined without any cessation of work . . . To call a suspension of work and act in concert to prevent a continuance of operations, without resorting to the legal measures open to determine the rights of the parties, amounts to a voluntary suspension of work, with the necessary consequences provided in the Act."

This conclusion is consistent with all of the decisions of this Court in which we have discussed the subject of lock-out. See *Burleson Unempl. Compensation Case,* 173 Pa. Superior Ct. 527, 533, 98 A. 2d 762; *Byerly Unemploy. Compensation Case,* supra; *Hogan Unempl. Compensation Case,* 169 Pa. Superior Ct. 554, 83 A. 2d 386.

Decision reversed.