Westinghouse Electric Corporation *v.* Unemployment Compensation Board of Review (No. 1).
Accurti Unemployment Compensation Case.

392

Argued June 13, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*John G. Wayman,* with him *Elder W. Marshall, James H. Hardie, W. D. Armour,* and *Reed, Smith, Shaw & McClay,* for appellant.

*Sydney Reuben,* Assistant Attorney General, with him *Thomas D. McBride,* Attorney General, for Unemployment Compensation Board of Review, appellee.

*Benjamin C. Sigal,* for appellees-intervenors.

OPINION BY RHODES, P. J., September 11, 1958:

This appeal by Westinghouse Electric Corporation is from a decision of the Unemployment Compensation Board of Review allowing benefits to employes at its East Pittsburgh Works and its Homewood Works in and about Pittsburgh.[1] The board concluded that they were unemployed by reason of a work stoppage which was a lockout.

The labor dispute arose when the company, after notice to the union and its employes, began a survey of work performed by day workers in the plant in East Pittsburgh. The union objected to the survey on the ground that the company had no right to make such survey under the terms of the existing collective bargaining agreement.

The claimants are members of Local 601 of the International Union of Electrical, Radio and Machine Workers, CIO (IUE), which is the bargaining agent for approximately nine thousand five hundred produc-

[1] The following appeals from decisions of the Unemployment Compensation Board of Review, involving the Westinghouse Electric Corporation as appellant or intervening appellee, were argued before this Court on June 13, 1958: Nos. 34, 35, 36, 37, 38, April Term, 1958, and No. 93, October Term, 1958. We have considered and decided the issues in four opinions filed concurrently as follows:

Westinghouse Electric Corporation v. Unemployment Compensation Board of Review (No. 2), Nos. 34 and 38, April Term, 1958. Claim of McCracken.

Westinghouse Electric Corporation v. Unemployment Compensation Board of Review (No. 3), No. 36, April Term, 1958, No. 93, October Term, 1958. Claim of Allman.

Westinghouse Electric Corporation v. Unemployment Compensation Board of Review (No. 4), No. 37, April Term, 1958. Claim of Gray.

tion employes at the two divisions of Westinghouse here involved. Approximately two thousand two hundred fifty of the production employes are known as "day workers" who are paid on an hourly basis. Their function is to provide services such as the operation of the cranes and elevators, moving and transporting materials, and sweeping. The remaining seven thousand two hundred fifty employes are "incentive workers" who are engaged in actual production and are paid on an incentive basis. In May, 1955, the company notified the union that it desired to make a survey of the work performed by day workers in the plant at East Pittsburgh for budgetary reasons and for the purpose of improving methods of operation. In June, 1955, the company began making a survey of ten or twelve workers employed in one section of the plant. The union objected on the ground that the company had no right to make a survey of day workers. The union also endeavored to obtain a commitment that the survey would not result in the layoff of any employes; the company refused to make such a commitment, and said that the survey might result in the elimination of workers as a result of changing methods developed therefrom. On June 17, 1955, the union filed a grievance. From then until August 1, 1955, numerous meetings were held by the company and the union during which the union requested that the survey be suspended and that the issue be arbitrated. The company, however, rejected this proposal.

In the latter part of July, the company determined that the information gathered by the survey was inadequate for its purposes; it then decided to make another test using different methods. On August 1, 1955, a representative of a department of the company began a study, with the aid of a watch, of the individual performance of one of the day workers. This worker was

observed for eight minutes, after which he refused to be observed and left work rather than submit to the time study. Nine other day workers left the same day as a result of the study. The following day one hundred thirty-three additional day workers walked out. Prior to this, time studies had not been used to measure the performance of the day workers; such studies were normally used on incentive workers to establish work standards which provided the basis for incentive payment.

On August 1, 1955, the day the second survey began, the company rejected a proposal that the survey be postponed for thirty days pending negotiations. Thereafter, on or about August 8, 1955, the union distributed leaflets stating that on August 7, 1955, the day workers had voted to strike and urged support of their strike by all of the membership. As a result about two thousand one hundred day workers stopped work; this was substantially all of such workers. Beginning August 8, 1955, the non-striking incentive workers were progressively furloughed because of their inability to work without the services normally provided by the day workers. On or about September 11, 1955, the work stoppage began in all the plants represented by the IUE. On September 15, 1955, the company and the union agreed that studies by the industrial engineering department would be limited to day workers in one section, and that there would be no changes in method, or in job classification, or decreases in personnel made as a result of such studies during the next sixty days; the dispute was thereby settled. Operations began to be resumed on that day, and on or about September 23, 1955, normal operations were in effect.

The bureau and the referee determined that the day workers and incentive workers were disqualified for

compensation under section 402 (d) of the Unemployment Compensation Law, 43 PS §802 (d), because the work stoppage resulted from a labor dispute, and that there was no lockout. On appeal, however, the Board of Review reversed the decision of the referee and allowed compensation on the basis that the company's "interjection of a change in the working conditions precipitated the work stoppage and was the final cause thereof." The appeal to this Court by Westinghouse followed. The decision of the board will be reversed.

Section 402 (d) of the Law, 43 PS §802 (d) provides: "An employe shall be ineligible for compensation for any week— . . . (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed: . . ." This labor dispute resulted from an alleged breach of the existing collective bargaining agreement by the company in making a study or survey of the day workers. To sustain claims for benefits it must appear that the employes were "unemployed through no fault of their own." Section 3 of the Law, 43 PS §752.

Employes who cease work because of an alleged breach of contract by the employer are not entitled to compensation where the collective bargaining agreement provides a grievance procedure for settlement of such disputes (*Glen Alden Coal Company v. Unemployment Compensation Board of Review,* 168 Pa. Superior Ct. 534, 536, 79 A. 2d 796), or where there are legal or equitable remedies available (*Arbechesky Unemployment Compensation Case,* 174 Pa. Superior Ct. 217, 222, 100 A. 2d 396; *Byerly Unemployment Compensation Case,* 171 Pa. Superior Ct. 303, 90 A. 2d 322; *Morris Unemployment Compensation Case,* 169 Pa. Superior Ct. 564, 569, 83 A. 2d 394; *Cassell Unemploy-*

*ment Compensation Case*, 167 Pa. Superior Ct. 440, 445, 446, 74 A. 2d 809; *Miller v. Unemployment Compensation Board of Review*, 152 Pa. Superior Ct. 315, 321, 31 A. 2d 740). The employes are required to avail themselves of contractual, legal, or equitable remedies for the settlement of disputes with their employers, without any cessation of work, in preference to the creation of a status of unemployment. The Unemployment Compensation Law was not intended to promote work stoppages. *Miller v. Unemployment Compensation Board of Review*, supra, 152 Pa. Superior Ct. 315, 321, 31 A. 2d 740.

The employes here chose to strike before fully exhausting the grievance procedure and without resorting to the remedies provided by law or in equity. The union may not have been required under the contract to carry the grievance beyond the stage of management's final reply to the original grievance, but that does not excuse the failure to exhaust the grievance procedure as outlined in the contract in an effort to settle the dispute without any cessation of work. The fact that the contract did not require the exhaustion of such remedy cannot be binding upon the unemployment compensation authorities who are charged with the duty of administering the Law and determining whether the employes are unemployed through no fault of their own.[2] This was a labor dispute founded upon a disagreement between the company and the employes over the terms of a subsisting collective bargaining agreement. The work stoppage was at the sole insistence of the employes who refused to work because of the purported breach of contract by the company. The resulting unemployment is not compensable. *Byerly*

---

[2] See *Gagliardi Unemployment Compensation Case*, 186 Pa. Superior Ct. 142, 151, 141 A. 2d 410.

*Unemployment Compensation Case,* supra, 171 Pa. Superior Ct. 303, 309, 90 A. 2d 322.

The board was of the opinion that the work stoppage was precipitated by the fact that the company changed the terms and conditions of employment and refused to rescind that change pending a settlement of the dispute. The board stated: "We believe that the refusal of the company to maintain the status quo for a short period of time and its interjection of a change in the working conditions precipitated the work stoppage and was the final cause thereof. Under these circumstances we believe that the work stoppage must be classed as a lockout." The board relied on the *McGinnis Unemployment Compensation Case,* 184 Pa. Superior Ct. 95, 132 A. 2d 749; and, although it did not specifically so state, it, in effect, although erroneously, applied the holding of this Court in the *Leto Unemployment Compensation Case,* 176 Pa. Superior Ct. 9, 106 A. 2d 652. In the *McGinnis* and *Leto* cases we reiterated that the inquiry in a work stoppage case must relate to the final cause and responsibility or fault for the work stoppage. The *McGinnis* case is inapplicable to the present situation. There the employer actually closed the plant in purported anticipation of a strike which was not actually impending; we affirmed the board's conclusion that it was a lockout. In the *Leto* case an employer refused to permit his employes to continue working at the expiration of a collective bargaining agreement unless they abided by major changes in the terms and conditions of employment. We there held that it was a lockout because it was unreasonable for the employer to refuse to permit the employes to continue working under the pre-existing terms and conditions of employment for a reasonable time pending settlement of the labor dispute resulting from negotiation of a new contract. The error

of the board in the present case was in applying the holding of the *Leto* case as the universal test for the determination of the final cause and responsibility or fault for the work stoppage. The *Leto* holding, however, is not so broad in its application. The *Leto* case did not expressly or by implication overrule the line of cases exemplified by the *Byerly Unemployment Compensation Case,* supra, 171 Pa. Superior Ct. 303, 90 A. 2d 322; nor did it purport, either expressly or by implication, to lay down a single mechanical test for determination of the final responsibility for the work stoppage.

The duty of the compensation authorities, as we have repeatedly said, is to determine whether the employes are unemployed through no fault of their own. If the employes have acted consistently with the desire to remain employed, they are entitled to compensation under the Law to alleviate the economic burdens commensurate with unemployment. In the *Leto* case the employer refused to permit the terms and conditions of the expiring contract to remain in effect for a reasonable time pending negotiation of a new contract; in fact, the employer withheld work from the employes for the sole purpose of gaining a concession from them. But, where a contract is in existence and the dispute concerns merely a breach of that contract by the employer, there are remedies available in the contract or in the courts for settlement of the dispute without any cessation of employment. Generally, none of these is available where the contract has expired and the dispute is in the negotiation of a new contract. In the former situation, although the employer may not be entirely without fault, there is fault attributable to the employes in failing to take advantage of the available remedies rather than create a status of unemployment. "The Unemployment Compensation Law was

not intended to promote stoppages of work by employes because of disputes with employers or bargaining agencies, which could be legally determined without any cessation of work. The fundamental idea of the Act is to provide a reserve fund to be used for the benefit of persons *unemployed through no fault of their own.* To call a suspension of work and act in concert to prevent a continuance of operations, without resorting to the legal measures open to determine the rights of the parties, amounts to a voluntary suspension of work, with the necessary consequences provided in the Act." *Miller v. Unemployment Compensation Board of Review,* supra, 152 Pa. Superior Ct. 315, 321, 31 A. 2d 740, 743.

It is argued on behalf of claimants that the remedies available in the contract under the grievance procedure, as well as the available legal remedies, were not reasonably adequate because the time involved in following any of the procedures might have been too lengthy to prevent the company from completing the disputed survey. The obvious answer to this is that the board did not find that the available remedies were inadequate; in fact, the board did not consider the effect of the available remedies since it placed its decision solely upon the basis of the company's refusal to maintain the status quo, under its erroneous interpretation of the *Leto* case. However, while the grievance procedure may or may not have been adequate from the standpoint of the time involved, it is certain that if the grievance procedure had been followed to a conclusion in favor of the employes the survey whether complete or incomplete would have been a nullity under the contract. If the making of the survey was to ignore the contract and would have resulted in irreparable harm to the employes, as it is contended, there was available a remedy in equity. *General Building*

*Contractors' Association v. Local Union No. 542,* 370
Pa. 73, 79, 87 A. 2d 250; *Philadelphia Marine Trade
Association v. International Longshoremen's Associa-
tion, Local Union No. 1291,* 382 Pa. 326, 115 A. 2d 733;
*King Unemployment Compensation Case,* 183 Pa. Su-
perior Ct. 629, 633, 133 A. 2d 581; *Arbechesky Unem-
ployment Compensation Case,* supra, 174 Pa. Superior
Ct. 217, 222, 100 A. 2d 396. In any event, in the ab-
sence of an equitable remedy, the employes would have
had a remedy in assumpsit for the damage suffered by
reason of any breach of the contract by the employer.
*King Unemployment Compensation Case,* supra, 183
Pa. Superior Ct. 629, 633, 133 A. 2d 581; *Byerly Un-
employment Compensation Case,* 171 Pa. Superior Ct.
303, 309, 90 A. 2d 322; *Morris Unemployment Com-
pensation Case,* supra, 169 Pa. Superior Ct. 564, 83 A.
2d 394.

It is contended, however, that the Pennsylvania
courts could give no relief because the purported breach
of contract was an unfair labor practice cognizable
only under the Labor Management Relations Act, 29
U.S.C.A. §141 et seq., by the National Labor Relations
Board, 29 U.S.C.A. §151 et seq., citing *Garner v.
Teamsters, Chauffeurs and Helpers Local Union No.
776,* 346 U.S. 485, 74 S. Ct. 161, 98 L. Ed. 228; and
*Elisco v. Rockwell Manufacturing Company,* 387 Pa.
274, 128 A. 2d 32. The *Garner* and *Elisco* cases do not
deprive the state courts of jurisdiction over the en-
forcement, interpretation, and preservation of the con-
tractual rights of the company and the union; these
cases hold only that, where a charge of unfair labor
practices has been lodged with, or an appropriate rem-
edy therefor is afforded through, the National Labor
Relations Board, the Pennsylvania courts have no ju-
risdiction to grant relief with respect to the alleged
unfair labor practice. *Elisco v. Rockwell Manufactur-
ing Company,* supra, 387 Pa. 274, 276, 128 A. 2d 32.

The federal assertion of power over labor disputes as contained in the Labor Management Relations Act and Norris-LaGuardia Act, 29 U.S.C.A. §101 et seq., however, does not deprive the state courts from exercising in equity their traditional power to require performance of the contractual duties or by injunctive relief to prevent irreparable damage which may be brought about by the failure to perform such duties. *Philadelphia Marine Trade Association v. International Longshoremen's Association, Local Union No. 1291*, supra, 382 Pa. 326, 332, 115 A. 2d 733. The jurisdiction of the National Labor Relations Board is not all inclusive. *Weber v. Anheuser-Busch, Inc.*, 348 U. S. 468, 474-477, 75 S. Ct. 480, 99 L. Ed. 546, 554, 555; *International Association of Machinists v. Gonzales*, 356 U. S. 617, 78 S. Ct. 923, 2 L. Ed. 2d 1018, 1021; *International Union, United Automobile, Aircraft and Agricultural Implement Workers of America v. Russell,* 356 U. S. 634, 78 S. Ct. 932, 2 L. Ed. 2d 1030, 1033, 1038; *MacDonald v. Feldman*, 393 Pa. 274, 142 A. 2d 1; *Fountain Hill Underwear Mills v. Amalgamated Clothing Workers' Union of America*, 393 Pa. 385, 394, 143 A. 2d 354. No unfair labor practice charge was filed in this case nor is one involved. The Pennsylvania courts are deprived of jurisdiction where the National Labor Relations Board affords an appropriate remedy; thus, if the Pennsylvania courts were deprived of jurisdiction because an appropriate remedy was available through the National Labor Relations Board, the fact that such an appropriate remedy was available but was not invoked by the employes before going on strike makes their unemployment non-compensable. If the matter was cognizable before the National Labor Relations Board and the continued making of the survey would have resulted in irreparable injury to the employes, the National Labor Relations Board itself had the power to

issue a cease and desist order or to obtain a temporary injunction to preserve the status quo. *Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776*, supra, 346 U. S. 485, 489, 74 S. Ct. 161, 98 L. Ed. 228, 239.

Although the strike initially involved only the day workers who objected to the survey, the work stoppage by these employes resulted in the furloughing of the incentive workers. The board found: "Beginning August 8, 1955 non-striking incentive workers were progressively furloughed because of their inability to work without the services normally provided by the day workers." The incentive workers as well as the day workers are ineligible for compensation because they were all members of the same labor union which was participating in, or directly interested in, the labor dispute which caused the work stoppage. Section 402 (d), 43 PS §802 (d); *Byerly Unemployment Compensation Case*, supra, 171 Pa. Superior Ct. 303, 311, 90 A. 2d 322; *Curcio Unemployment Compensation Case*, 165 Pa. Superior Ct. 385, 391, 68 A. 2d 393; *Stahlman Unemployment Compensation Case*, 187 Pa. Superior Ct. 246, 144 A. 2d 670.

The decision is reversed.

---

Westinghouse Electric Corporation *v.* Unemployment Compensation Board of Review (No. 2). McCracken Unemployment Compensation Case.