551 A.2d 1157

Billie G. Murdoca et al., Petitioners *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

Argued November 4, 1988, before Judges BARRY and COLINS, and Senior Judge KALISH, sitting as a panel of three.

*James A. Diamond,* with him, *Elliot A. Strokoff, Handler, Gerber, Johnston, Strokoff & Cowden,* for petitioners.

*John Herzog,* Assistant Counsel, with him, *James K. Bradley,* Assistant Counsel, and *Clifford F. Blaze,* Deputy Chief Counsel, for respondent.

OPINION BY JUDGE COLINS, December 22, 1988:

Billie G. Murdoca, lead token claimant,[1] appeals from a decision of the Unemployment Compensation Board of Review (Board) which affirmed the decision of the referee denying her and other similarly situated employees of Beverly Blouse Company (Beverly) benefits for the period November 5, 1985 through December 3, 1985. During the period at issue, Beverly and the employees' bargaining representative, the International Ladies Garment Workers Union, Local 234 (Union), were engaged in a labor dispute.

---

[1] Claimants in this matter, as indicated on the petition for review, are as follows: Billie G. Murdoca, Theresa Williams, Eleanor F. Jones, Catherine A. Hawk, Florence P. Lahr, Jean VanNoord, Dawn M. Flyte, Betty J. Kratzer, Irene Haas, Wendy B. Paul, Marie N. Becker, Sally T. Anthony, Janice Bolmer, Jane H. Schell, Susan B. Faust, Kathy L. Femaly, Julian E. Buskirk, Carol E. Johnson, Alice B. Peters, Mae R. Stauffer, Audrey D. Welty, Lorraine D. Mitman, Gertrude Ferris, Marcella T. Smith and Margaret B. Racz.

A collective bargaining agreement (agreement) between Beverly and the Union was in force during the period at issue, this agreement having become effective as of June 1, 1985 and having an expiration date of May 31, 1988. The agreement which was entered into evidence before the referee is contained in the record. Article Seventeenth of the agreement provides for a minimum wage of $4.90 per hour for certain union employees. Article Seventeenth, Section 5[2] sets out the procedure for handling employees whom Beverly believes to be performing substandard work.

About a month and a half prior to the work stoppage Beverly was, with knowledge of the Union engineer, in the process of preparing a list of those employees whom it believed to be performing substandard work. At the close of work on November 20, 1985, Beverly's manager, Glen Miller, called the workers on the list aside, without Union representation present, and attempted to get those employees to sign agreements accepting a reduced wage of $4.20 per hour. The employees refused to sign and notified the Union on the following day. The Union, in turn, immediately notified Beverly's collective bargaining representative Arnold Delin (Delin), Executive Director, Atlantic Apparel Contractors Association, Inc. (AACA)[3] informing him of Beverly's action. Delin

---

[2] 5(a) *Special Workers*—If an employer believes a worker's make-up is excessive, the employer shall have the obligation to submit a validation of the piece rates applied to the operations being done by the worker. The Union shall have the right to check the validation and if necessary assign qualified engineers to evaluate the piece rates. Upon agreement by both parties (engineers), the worker shall be declared substandard and shall be paid a rate of not less than $4.20 an hour.

(b) Disagreement between the parties shall be subject to arbitration by the Impartial Chairman.

[3] The AACA, of which Beverly is a member, consists of several member employers (contractors) and provides collective bargaining with the Union for all its members as a unit.

agreed that the attempt by Beverly to unilaterally reduce wages was improper and clearly in violation of the agreement.

Notwithstanding the above, when the workers on the list received their pay checks on Friday, November 22, 1985, they discovered a reduction in their pay from $4.90 per hour to $4.20 per hour retroactively to the week ending Friday, November 15, 1985. At this point the record becomes unclear as to the sequence of events that followed. Additionally, the Board never made specific findings of fact concerning the actual events of the work stoppage. As evidenced in the record, Delin testified that two meetings were held prior to the November 25 work stoppage for the purpose of averting a stoppage, at which he was present along with the principals of Beverly, the Union's officials and the two shop chair ladies. Notes of Testimony pp. 13, 15. However, Earl Laub (Laub), Union District Manager, testified that the above-referenced meetings were held subsequent to the work stoppage specifically on the evening of Monday, November 25, and on the following Monday, December 2. Notes of Testimony pp. 20-21. Either way, it is clear in the record that Beverly unilaterally and retroactively changed the terms and conditions of the agreement. As a result, all but "one or two" of the workforce failed to report for work on Monday, November 25, 1985 and did not begin returning to work until December 3, 1985.

It appears from Laub's testimony that an offer was made at the Monday, November 25th meeting whereby the employees agreed to return to work if Beverly agreed to reinstate the minimum wage provided for under the agreement.

CL: With respect to returning to work, was there any offer made by the workers concerning under what conditions they would return to work?

CU1: Yes they would return to work if the wages were put back to $4.90 an hour and that was really the substance of the meeting.

CL: Was in [sic] the $4.90 an hour specificed [sic] in the collective agreement. And what was the response from if any ah, from Mr. Delin ah, or Ms. DiMatteo or Mr. Miller.

CU1: Well, Mr. Delin ah, explained to ah, his people ah, DiMatteo and Miller that this was the agreement and ah, the procedures that ah everybody had to ah, live up to in the agreement, and the meeting ended ah, because ah, Beverly DiMatteo and Glenn Miller did not have the final say in the settlement and that's what broke up, Billy broke up the meeting, and what was the purpose of us meeting.

Notes of Testimony pp. 20-21. However, Laub testified it was not resolved until the December 2 meeting that Beverly would reinstate the original rate of pay to those employees affected by the reduction. It was also agreed that Beverly's engineers, along with Union appointed engineers, would study the rates and if it was determined that any employee had improperly lost wages, she would be reimbursed. Notice of the resolution was communicated to the employees who then returned to work the following day, December 3. No agreement was reached regarding reimbursement of the withheld wages, nor were any assurances given that those employees would *ever* receive the withheld wages.

Claimants filed for unemployment compensation benefits with the Office of Employment Security (OES) with lead claimant, Billie Murdoca's application being effective as of December 9, 1984. The OES issued a determination granting benefits pursuant to Section 402(d) of the Pennsylvania Unemployment Compensa-

tion Law (Law),[4] finding that the work stoppage was caused by Beverly arbitrarily reducing the hourly rate of pay required under the existing agreement. Beverly appealed the determination and an evidentiary hearing was held on January 31, 1986. The referee issued a decision reversing the determination of the OES on February 5, 1986, and denying benefits under Section 402(d) of the Law, 43 P.S. §802(d), on the basis that neither the claimant nor the Union had exhausted their remedies under the agreement prior to instituting the work stoppage. Claimants filed timely appeals from this decision to the Board. The Board, on August 18, 1986, issued a decision in the appeal of Billie Murdoca et al., and a substantially similar order in the appeal of Lorraine D. Mitman et al., which affirmed the determinations of the referee and denied benefits. There are no findings of fact and conclusions of law set out in the Mitman order because the facts and issues of that case were substantially similar to the Murdoca case. These cases were consolidated for appeal and are now before this Court.

Our scope of review is limited to whether substantial evidence exists to support the factual findings made and whether there has been a violation of constitutional rights or an error of law. *Estate of McGovern v. State Employees' Retirement Board,* 512 Pa. 377, 517 A.2d 523 (1986). Claimants in this case have the burden of proving their eligibility for benefits. *Kanouse v. Unemployment Compensation Board of Review,* 9 Pa. Commonwealth Ct. 188, 305 A.2d 782 (1973). Further, a claimant whose employment has been interrupted by a work stoppage as a result of a labor dispute bears the burden of proving that the stoppage resulted from a

---

[4] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §802(d).

lockout. *Bishop v. Unemployment Compensation Board of Review,* 90 Pa. Commonwealth Ct. 553, 496 A.2d 110 (1985).

Section 402(d) of the Law, 43 P.S. §802(d), provides that an employee shall be ineligible for compensation for any week in which his unemployment is due to a stoppage of work which exists because of a labor dispute other than a lockout at the factory, establishment, or other premises at which he was last employed. "Once we accept as fact that the ultimate responsibility for the work stoppage lay with the employer, it is clear that there has been a 'lockout' thus qualifying the claimants for benefits under the Act." *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 445-46, 163 A.2d 91, 94 (1960). Thus, the determination of whether a work stoppage is a lockout or a strike is crucial to the award of benefits. "It has been long established that it is the duty of the compensation authorities to ascertain the final cause and responsibility for the work stoppage." *Id.*

In the instant case, claimant's primary contention is that the Board failed to ascertain the final cause for the work stoppage. The Board by implication characterized the work stoppage as a strike and found that the Union failed to follow the grievance procedure provided for in the agreement for the settlement of such disputes. However, nowhere did the Board explicitly state that a strike occurred. The issue of whether a work stoppage was caused by management or by the union for purposes of determining whether employees are eligible for unemployment compensation benefits is a mixed question of law and fact. *Philco Corp. v. Unemployment Compensation Board of Review,* 430 Pa. 101, 242 A.2d 454 (1968); *Vrotney.* Thus, in reviewing the Board's decision, our Court is required to make an independent determination. *Norwin School District v. Belan,* 510 Pa. 255, 507 A.2d 373 (1986).

In determining whether a dispute should be characterized as a strike or a lockout, our Supreme Court formulated the *Vrotney* test:

> Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' and the disqualification for unemployment compensation benefits in the case of a 'stoppage of work because of a labor dispute' does not apply.

*Vrotney*, 400 Pa. at 444-45, 163 A.2d at 93-94.

Our Supreme Court reaffirmed the *Vrotney* test most recently in *Miceli v. Unemployment Compensation Board of Review*, 519 Pa. 515, 549 A.2d 113 (1988), noting the well-established test has been consistently applied in unemployment compensation cases where a work stoppage has resulted from a labor dispute. *Id.*, slip op. at 6. Our Supreme Court had previously refined the test in *Philco* asserting that in order to serve the purpose of our unemployment compensation system "logically the test of whether a work stoppage resulted from a strike or a lock-out requires us to determine which side, union or management, first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing." *Id.* at 103, 242 A.2d at 455.

The term "status quo" has been defined as the last actual peaceable uncontested status that preceded the

work stoppage. *Miceli,* slip op. at 7. Additionally, status quo does not look to the parties' previous conduct but is limited to those pre-existing terms and conditions of employment contained in the expired agreement. *Id.,* slip op. at 13.

In *Miceli* the sole issue to be determined was whether the work stoppage was a strike or a lockout. The Union and Quaker Oats Company were parties to two collective bargaining agreements which had expired while negotiations proceeded for a new agreement. During negotiations, Quaker Oats Company unilaterally altered the status quo by requiring mandatory overtime of the employees, which was never a term of the previous agreements. A work stoppage resulted. Therefore, since mandatory overtime was not part of the expired agreement, the court found that Quaker Oats Company first altered the status quo and awarded benefits to the claimants.

It should be noted that in *Miceli* the labor dispute arose during the negotiations period subsequent to the previous agreement's expiration and prior to the signing of a new agreement. However, in the instant case, the labor dispute arose while the agreement was viable and in force.

In a case more closely analogous to the instant one, our Supreme Court affirmed this Court's holding that unilateral action by an employer in modifying an existing collective bargaining agreement constituted a "lockout" under the Law and allowed employees to recover benefits. *Odgers v. Unemployment Compensation Board of Review,* 514 Pa. 378, 525 A.2d 359 (1987) *(Odgers II).* In *Odgers II* the employer unilaterally implemented different terms than those agreed to by the parties in their collective bargaining agreement and thereby breached the agreement. The employer failed to reinstate the relationship that existed at the time it

repudiated the agreement and a work stoppage ensued. Our Supreme Court cited *Philco* for the general rule that when a work stoppage takes the form of a strike, the union has the burden of showing that it made the initial move by offering to continue the status quo. The court stated further "we have held that the union's burden is satisfied where the employer's unilateral actions in fact disturb the status quo." *Odgers*, 514 Pa. at 392, 525 A.2d at 366.

The claimants involved here were all earning subsistence wages such that would only provide for the basic necessities of living. Beverly unilaterally and substantially reduced their wages even further, severely limiting claimants' ability to provide basic necessities for themselves and their families. This was not an instance where claimants voluntarily withheld their labor to extract more wages than due but instead were merely trying to maintain what they had in the face of economic pressure. Claimants point to the language in *Odgers II* as especially compelling in light of the extraordinary circumstances before us:

> Their choices were two: to agree to work under unilaterally imposed, changed conditions, or to withhold their services. We have never held that an employee must choose the former course in order to preserve entitlement to unemployment compensation benefits, and we decline to do so now.

*Id.* at 393, 525 A.2d at 366. We are in agreement with claimants that Beverly's unilateral retroactive reduction in wages constituted so egregious a breach of the agreement that Beverly must bear the responsibility for the work stoppage. Here, Beverly not only materially changed the terms of employment in violation of the agreement but additionally, refused to reinstate the status quo until the dispute could be resolved. There-

fore, claimants did not have the option to work under the conditions that existed prior to the repudiation.

Claimant raises the second issue of whether the "availability of alternative remedies doctrine" is still viable in Pennsylvania. Claimant asserts that there is no blanket application of the availability of alternative remedies doctrine in Pennsylvania and that accordingly the Board erred as a matter of law in disqualifying claimants on the basis that they did not exhaust all legal and equitable remedies available. We agree. While the availability of alternative remedies doctrine remains viable generally, there are exceptions to its application. President Judge CRUMLISH in *Odgers v. Unemployment Compensation Board of Review,* 89 Pa. Commonwealth Ct. 439, 451, 492 A.2d 808, 815 (1985) *(Odgers I),* (citing *Accurti Unemployment Compensation Case,* 187 Pa. Superior Ct. 391, 144 A.2d 673 (1958)), reaffirmed the general rule that our courts have applied the availability of alternative remedies doctrine where a work stoppage occurs during the term of a collective bargaining agreement.[5]

However, as this Court indicated in footnote 16 of *Odgers I,* Pennsylvania courts have not consistently applied the availability of remedies doctrine. In addition, we noted that the doctrine has been rejected by many commentators. *Id.* at 452-53 n.16, 492 A.2d at 815-16 n.16. *See Southerland Unemployment Compensation*

---

[5] Some courts have denied benefits to employees reasoning that those employees should have sought other available remedies before instituting work stoppages. *See, e.g., Accurti,* wherein the employer began a work survey over objection by the Union; *King Unemployment Compensation Case,* 183 Pa. Superior Ct. 629, 133 A.2d 581 (1957), wherein a work stoppage resulted from a dispute concerning mine safety; and *Arbechesky Unemployment Compensation Case,* 174 Pa. Superior Ct. 217, 100 A.2d 396 (1953), wherein the employer did not make contributions to a Health and Welfare Fund as required under the collective bargaining agreement.

*Case*, 202 Pa. Superior Ct. 149, 195 A.2d 138 (1963), wherein the claimants were awarded compensation after a work stoppage was precipitated by a situation which the employees perceived to be a risk to their safety.

In *Odgers II* our Supreme Court affirmed this Court's holding to award benefits and disagreed with the Board's contention that the union's failure to follow grievance procedures prescribed in the agreement prior to instituting a work stoppage violated the alternative remedies doctrine. The Court adopted the reasoning of this Court in rejecting the necessity of filing a grievance in view of the severity of the employer's breach of the agreement.

We apply the rationale set forth in *Odgers II* to the case at bar. In doing so, we hold that denying unemployment compensation benefits in this situation would render illusory a validly entered into collective bargaining agreement.

We conclude, therefore, that the Board erred as a matter of law in its characterization of the work stoppage as being in the nature of a strike and find that Beverly's action must be deemed a "lock-out". Thus, benefits cannot be denied under the provisions of Section 402(d) of the Law.

Accordingly, we reverse the decision of the Board as to both the Murdoca and the Mitman matters.

## ORDER

AND NOW, this 22nd day of December, 1988, the orders of the Unemployment Compensation Board of Review in the above-captioned matter are hereby reversed.