**KAOLIN MUSHROOM FARMS, INC., Petitioner,**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 11, 1995.

Decided Dec. 22, 1995.

Robert G. Haas, for petitioner.

Judith M. Gilroy, Assistant Counsel, for respondent.

Arthur N. Read, for intervenor.

Before FRIEDMAN and NEWMAN, JJ., and LORD, Senior Judge.

NEWMAN, Judge.

Kaolin Mushroom Farms, Inc. (Employer) appeals from an order of the Unemployment Compensation Board of Review (Board) that reversed the decision of the referee denying benefits to thirty-seven employees (Claimants) pursuant to Section 402(d) of the Un-

employment Compensation Law (Law).[1] We affirm.

Employer operates a mushroom farm in Kennett Square, Chester County. On April 1, 1993, a number of pickers and packers initiated a work stoppage because of Employer's plan to change its method of compensation and to change the way in which pickers arrange mushrooms in boxes. At the time, there was no collective bargaining agreement between Employer and its employees, although attempts were being made to unionize the workers.

In April 1993, Claimants applied for unemployment compensation benefits. On December 30, 1993, the Chester County Job Center (Job Center) issued notices of determination granting benefits to Claimants for the following reasons: (1) Employer initiated a lockout on April 1, 1993; and (2) work was unavailable to Claimants because shortly after that, Employer began hiring permanent replacements.

Employer appealed the Job Center's determinations to the referee, and a hearing was held on April 13, 1994. For purposes of appeal, the cases were separated into four lead cases. On April 26, 1994, the referee issued thirty-seven decisions denying benefits to Claimants on the basis that they had engaged in a strike and Employer did not permanently replace them.

Claimants appealed the referee's decision to the Board, which by decision and order dated August 5, 1994, in the lead case of Agustin P. Gomez, reversed the decision of the referee. The Board made the following relevant findings of fact:

3. The workers' pay and benefits were determined unilaterally by the employer with input from the employees which the employer would decide whether to accept or reject.

4. In February 1993, the employer informed the packing employees that it was changing its method of compensation to a lower base wage rate, but it would pay more for overtime work.

5. As was their practice, the employer held meetings with the farm workers to announce their contemplated changes. The packers [sic] pay changes were implemented without modifications in mid-March despite the fact that some packers voiced an opinion that the changes would result in a loss of remuneration to them.

6. On March 31, 1993, the employer announced a rate increase in the rate of piece work for the pickers. However, the employer announced its intention to require that the mushrooms be "capped," meaning that they had to be placed in the box with their caps up.

7. Many of the pickers opposed the capping requirement because it would slow them down and cost them income.

8. The employer held four meetings at which he told the employees contradictory information concerning the capping requirement.

9. The employees on the morning shift believed that the capping requirement would go into effect on April 1, 1993.

10. On April 1, 1993, at approximately 5:00 a.m., packers and pickers at the claimant's work site initiated a work stoppage and established and maintained picket lines.

11. The employer never generally distributed any notice that the capping requirement was rescinded.

12. The employer distributed literature telling the employees that they would be permanently replaced as of April 2, 1993, if they did not return to work.

13. The employer contacted an employment agency and began to hire replacement workers through that agency as of April 2, 1993.

14. On April 6, 1993, the employer distributed literature telling the employees that it was nearly finished hiring replacement workers.

---

1. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(d), which provides that an employee shall be ineligible for compensation for any week in which his unemployment is due to a stoppage of work that exists because of a labor dispute other than a lockout.

15. On April 30, 1993, the fifty-eight employees who had remained away from work made an unconditional offer to return to work at Kaolin.

16. The offer to return to work was accepted by the employer, except as to employees who had been discharged for reasons not at issue here.

Board's Decision, dated August 5, 1994 at 1–2.

The Board concluded that a lockout had occurred, and that Claimants were not disqualified from receiving benefits under Section 402(d) of the Law. Employer requested reconsideration, which the Board denied on August 25, 1994. This appeal followed.

On appeal to this court, Employer raises the following two issues: (1) whether the Board erred as a matter of law and made findings of fact not supported by substantial evidence when it determined that a lockout rather than a strike had occurred; and (2) whether the Board erred as a matter of law and made findings of fact not supported by substantial evidence when it determined that Employer permanently replaced Claimants.[2]

■ With respect to the first issue, the law is clear that when employees engage in a work stoppage during the existence or upon the expiration of a collective bargaining agreement, the threshold question is whether the stoppage is a strike or a lockout. *Philco Corp. v. Unemployment Compensation Board of Review*, 430 Pa. 101, 242 A.2d 454 (1968); *Vrotney Unemployment Compensation Case*, 400 Pa. 440, 163 A.2d 91 (1960); *Accurti Unemployment Compensation Case*, 187 Pa.Superior Ct. 391, 144 A.2d 673 (1958); *Murdoca v. Unemployment Compensation Board of Review*, 122 Pa.Cmwlth. 303, 551 A.2d 1157 (1988). A strike is defined as "the act of quitting work done by a body of workmen as a means to enforcing compliance with the demands made of their employer." *Armour Leather Co. v. Unemployment Compensation Board of Review*, 192 Pa.Superior Ct. 190, 195, 159 A.2d 772, 775 (1960). A lockout is "an employer's withholding of work from

his employees in order to gain concessions." *Id.* at 195, 159 A.2d at 774. As the Supreme Court stated in *Philco*, 430 Pa. at 103, 242 A.2d at 455:

> Since the purpose of our unemployment compensation system is to compensate an individual when work has been denied him through no fault of his own, logically the test of whether a work stoppage resulted from a strike or a lockout requires us to determine which side, union or management, first refused to continue operations under the status quo . . . .

In the instant matter, Employer argues that the Board should not have reached a strike/lockout analysis because it is inapplicable where workers are unrepresented by a labor organization. In support of its position, Employer cites *Birdsboro Corp. v. Unemployment Compensation Board of Review*, 59 Pa.Cmwlth. 462, 430 A.2d 361 (1981), in which this court noted that where no collective bargaining agreement exists, a work stoppage cannot be regarded as an illegal strike or labor union action. Employer argues the corollary of that proposition. Namely, in the absence of a prior collective bargaining agreement, workers are at-will employees whose employers may change policies as they deem appropriate. Therefore, a change in the terms and conditions of employment cannot constitute a lockout.

■ Our review of Pennsylvania appellate court decisions indicates that the strike/lockout analysis has only been applied where employees are represented by a bargaining unit, and there is an existing or recently expired collective bargaining agreement. Application of a strike/lockout analysis in the absence of a collective bargaining agreement would mean that unrepresented employees who engage in a work stoppage because of any unilateral change imposed by an employer are eligible to receive unemployment compensation benefits. Such a result is unfair to employers because it prevents them from instituting even minor changes to

2. Our scope of review is limited to determining whether constitutional rights have been violated, whether an error of law has been committed and whether factual findings necessary to support the adjudication are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704.

the terms of employment without the consent of the employees. Accordingly, we hold that when unrepresented workers engage in a work stoppage because of a change in terms or conditions of employment, the appropriate inquiry is whether such change is substantial.[3] Where employees who engage in a work stoppage establish that their employer unilaterally imposed a substantial change, they are eligible for unemployment compensation benefits.

In the instant matter, the Board found that Employer lowered the base wage of the pickers but increased the amount it paid them for overtime work. Employer implemented these changes over the objection of some packers (Finding of Fact No. 5). The Board also found that Employer announced an increase in the rate for piece work done by the pickers and required that they "cap" the mushrooms (Finding of Fact No. 6). Many pickers opposed the "capping" requirement because it would slow them down and reduce their income (Finding of Fact No. 7). With respect to the effect of the changes on the employees' compensation, the following exchange took place between Claimant Luis Tlaseca Flores and the referee:

> Referee: Why were you on strike?
>
> Claimant: Because we were not in agreement about our wage; it had been reduced. .
>
> Referee: How was your wage reduced?
>
> Claimant: $1.30 an hour.
>
> Referee: When was it reduced? Do you remember?
>
> Claimant: I'm not sure, the 18th of March.
>
> Referee: What was your wage before it was reduced?
>
> Claimant: Average $300 a week.
>
> Referee: What was your wage?
>
> Claimant: Reduced from the salary.
>
> Referee: No.
>
> Claimant: $6.
>
> Referee: Did you customarily then work 50 hours a week?
>
> Claimant: Yes.
>
> Referee: And after mid-March did you also work 50 hours a week?
>
> Claimant: Yes.
>
> Referee: And when you said $300 was that your weekly pay that you were accustomed to receiving before the change in mid-March?
>
> Claimant: Yes.
>
> Referee: And what wage did you customarily receive in the weeks following the change?
>
> Claimant: $270.

Notes of Testimony, Hearing of April 13, 1994 at 88.

Our review of the record indicates that the only testimony offered regarding a change in compensation was that Claimant Flores' wages were reduced by ten percent. While *Steinberg Vision Associates v. Unemployment Compensation Board of Review*, 154 Pa.Cmwlth. 486, 624 A.2d 237 (1993), held that no particular percentage distinguishes a substantial wage reduction from a non-substantial one, the Court noted that "a 14.2% wage reduction is at the cusp of what is considered to be a substantial impact." *Id.* 624 A.2d at 240. Because of the lack of testimony regarding the effect of the reduction on Claimants, we conclude that they did not meet their burden of establishing a substantial change in the terms and conditions of their employment. Accordingly, Claimants, like organized workers who engage in a strike, are precluded from receiving unem-

---

3. Pursuant to Section 402(b) of the Act, an individual who quits work for "cause of a necessitous and compelling nature" is eligible for unemployment compensation benefits. The question of whether a unilateral change in terms of employment constitutes "cause of a necessitous and compelling nature" is subject to a substantial change analysis. *Steinberg Vision Associates v. Unemployment Compensation Board of Review*, 154 Pa.Cmwlth. 486, 624 A.2d 237 (1993).

Section 402(b) states, "[T]he provisions of this subsection shall not apply in the event of a stoppage of work which exists because of a labor dispute within the meaning of subsection (d)." While Section 402(b) does not apply here because Claimants did not quit, but engaged in a work stoppage, the substantial change analysis, as set forth in *Steinberg*, is properly applied.

ployment compensation benefits pursuant to Section 402(d) of the Law.

■ Employer next argues that the Board erred in determining that Claimants were permanently replaced, thereby making them eligible for benefits even if they were engaged in a strike. In *Canonsburg v. Unemployment Compensation Board of Review*, 156 Pa.Cmwlth. 533, 628 A.2d 503, 510 (1993), *aff'd*, 540 Pa. 531, 658 A.2d 790 (1995), this court held:

> [W]here an employer hires *permanent* replacement employees, absent any evidence in the record and pertinent findings thereon that continuing work remains available to the striking workers, the case must be considered as one where the employment relationship has been severed.... We further make it clear that the burden is upon the employer to show that it advised the striking employees that despite the hiring of permanent replacements work was still available to them. [Emphasis in original.]

Employer does not dispute that it hired replacement workers, but maintains that they were temporary rather than permanent. However, the Board found that Employer distributed literature informing employees that they would be permanently replaced as of April 2, 1993 if they did not return to work (Finding of Fact No. 12). Employer's witness Michael Pia, an owner of the company, testified that he handed out and posted the following notice:

### IMPORTANT NOTICE TO EMPLOYEES OF KAOLIN MUSHROOM FARMS, INC.

If you are participating in the work stoppage that occurred on 4/1/93 you need to know the following.

1. You are welcome to return to your regular job on Friday 4/2/93. Most positions will still be open, however, since we have already begun hiring replacement workers, there are no guarantees.

2. If you do not return to work by Friday 4/2/93, or do not notify us by then of your

intention to return to work, *YOU WILL BE REPLACED*.

3. Any employee who makes any attempt to disrupt the work place, or who makes any threats to employees or replacement workers who are working or attempting to do their jobs, *WILL BE FIRED IMMEDIATELY AND WILL NOT BE REHIRED BY THE COMPANY*.

It would be very unfortunate if this situation were to continue. We felt we were working in your interest and we were disappointed that you would put your trust in someone such as Venture (sic) Gutierrez [4] whose only interest is to form a (sic) organization for profit, which will be supported through your earnings. He can guarantee *NOTHING* for you or your family.

Please, for your benefit, remember that you do not have to listen to these people and you do not have to sign any cards that they give to you. If you have signed these cards, YOU HAVE THE RIGHT TO HAVE YOUR SIGNATURE REVOKED.

*PLEASE CONSIDER THIS DECISION VERY CAREFULLY*

Reproduced Record at 164a (footnote added).

Viewed in isolation, this notice does not constitute substantial evidence to support a finding that Employer began replacing striking workers on a permanent basis on April 2, 1993. However, when read in conjunction with the following notice posted by Employer on April 6, 1993, we agree that the Board properly made such a finding.

Good Afternoon:

This is another day, the sixth day for you out of work and one more day withou [sic] earning money. How long can you afford to be out of work? [M]ost of you have families and need to earn money to support them, and every day we have to hire new people to replace you *permanently*.

Kaolin is a company that offers you a good job. What has Ventura offered you? He told you that in three days the Company would be on its knees. Today it has been six days, and the truth is the Company is very strong. In the next few days we will

4. Ventura Gutierrez is a non-employee labor organizer.

be hiring all the personnel we need and everything will be back to normal.

We would like all our workers to return since most of you could be replaced permanently, Ask Ventura if he is going to pay your salaries next Thursday. Also ask him how much money he is going to retain from you anually [sic] in Union dues. Ask him to tell you what happened at Sunny Valley Farms; ask him if he is going to feed your families and finally ask him if he is going to find a new job for you if you are replaced from this Company permanently. *Think about the decisions you are about to make. This decision is important, not only for you but for those families who depend on you and your jobs for their support. You have to make this decision yourselfs [sic] and not allow anyone who is after your money and who is not interested in your family welfare to influence you. If Ventura were interested in your welfare he would not have allowed you to jeopardize your jobs.*

For those employees who have remained with us during the strike, we would like to thank them for their loyalty and for the work they have done during a period that could have been difficult. Thanks to you, the Company was able to fullfill [sic] and will continue fullfilling [sic] its obligations. *For those of you who walk out, if you wish to return to work, the doors are open to you and you will be welcome by the Company, If that is not what you wish to do, all we have left to say is good luck in the future and God Bless you.*

Reproduced Record at 166a (emphasis added).

Although the last paragraph of the notice indicates that Employer is willing to rehire the striking employees, the first paragraph clearly states that Employer is in the process of hiring permanent replacements. The second paragraph implies that Employer will shortly be replacing all striking employees and that continuing work will no longer be available to them. Accordingly, there is substantial evidence in the record that Employer *informed* its employees that they would be permanently replaced as of April 2, 1993, and that on April 6, 1993, Employer told its em-

ployees that it was nearly finished hiring replacement workers. Therefore, we conclude that Employer did not meet its burden of establishing that work was still available to the striking employees.

Employer further argues that because it rehired fifty-eight of the striking employees, it could not have permanently replaced them. We agree with the Board that the subsequent rehiring of employees under new terms of employment is irrelevant because it occurred after the weeks at issue and does not affect the fact that Employer informed Claimants that they were being permanently replaced.

For these reasons, we affirm the decision of the Board.

FRIEDMAN, J., concurs in the result only.

### *ORDER*

AND NOW, December 22, 1995, we affirm the order of the Unemployment Compensation Board of Review.

LORD, Senior Judge, concurring.

I concur. I thoroughly agree with the majority opinion in all but one respect.

While a reduction of ten percent in wages may not be substantial in some instances, and while there is admittedly language in *Steinberg Vision Associates* noting that "a 14.2% wage reduction is at the cusp," of having a substantial impact, I cannot agree that a ten percent reduction in the wages of a mushroom picker making $6 per hour is not a substantial reduction. I cannot accept the notion of a percentage-based "cusp" because I am convinced that the percentage varies with the wage—the less the wages, the more impact any percentage reduction has.

FRIEDMAN, J., joins in this concurring opinion.