Lakeview Forge Company, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review et al., Respondents.

Argued May 3, 1978, before President Judge Bow-MAN and Judges CRUMLISH, JR., WILKINSON, JR., MEN-CER, ROGERS and BLATT. Judge DiSALLE did not participate.

*Irving Murphy,* with him *David E. Holland,* and *MacDonald, Illig, Jones & Britton,* for appellant.

*Charles G. Hasson,* Assistant Attorney General, with him *Michael Klein,* Assistant Attorney General, and *Robert P. Kane,* Attorney General, for appellee.

OPINION BY JUDGE ROGERS, June 21, 1978:

Lakeview Forge Company (Lakeview) has filed a petition for review of an order of the Unemployment Compensation Board of Review affirming a referee's decision that the nine respondents, Lakeview employes, were eligible to receive compensation on account of a period of unemployment coincident with a labor dispute. Lakeview maintains that the respondents who are members of Erie Lodge No. 270 of the International Die Sinkers Conference (IDSC) should have been denied benefits based on Subsection 402(d) of the Unemployment Compensation Law (Law),[1] 43 P.S. §802(d).

Subsection 402(d) provides that:

An employe shall be ineligible for compensation for any week—

. . . .

> (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed: Provided,

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended.*

That this subsection shall not apply if it is shown that (1) he is not participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (2) he is not a member of an organization which is participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (3) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in, or directly interested in, the dispute.

After a hearing, the referee made the following pertinent findings of fact in each of the nine cases before him:

2. The [representative] claimant is a member of Erie Lodge No. 270 of the International Die Sinkers Conference, the collective bargaining representative of the claimant and ten fellow die sinkers employed by the employer.

3. The collective bargaining agreement with respect to economic matters between Erie Lodge 270 of the die sinkers and the employer expired on July 31, 1975 without agreement upon a new contract and the claimant and his fellow die sinkers continued work thereafter under the terms of the expired contract pending settlement upon a new agreement.

4. Local 4666 of the United Steel Workers is the collective bargaining representative of approximately 65 production and maintenance employees of the employer at the plant where the claimant was employed and

the collective bargaining agreement between that union local and the employer expired on August 31, 1975.

5. Because representatives of the employer and of Local 4666 were unable to agree upon the terms of a new contract prior to August 31, 1975, a work stoppage due to a labor dispute, other than a lockout, commenced at the employer's plant by members of Local 4666 on September 2, 1975.

6. The dispute between Local 4666 and the employer was not settled until on or about November 13, 1975 and following September 2, 1975 until settlement picket lines were maintained at the employer's plant site by members of Local 4666.

7. The picket line was maintained by numbers of pickets in excess of 50 until reduced to 10 by an Order of Court sought by the employer and issued on or about September 12, 1975.

8. Although the number of pickets was reduced to 10 by the Court Order of September 12, 1975 members of Local 4666 appeared on the picket line in greater numbers at intervals during the work stoppage.

9. On September 2, 1975 the claimant and his fellow die sinkers appeared at the entranceway to the employer's plant to report for work but were met by picketing members of Local 4666 who possessed clubs, sticks, and ice picks, who physically pushed back some of the die sinkers, and who threatened to 'crack the skulls' of any die sinker who would attempt to enter the employer's plant.

10. The claimant and his fellow die sinkers continued to report to the employer's plant on

virtually a daily basis after September 2, 1975, were met by the pickets at the employer's plant entrance, and in or about early October of 1975, after contact had been made by the shop steward of the die sinkers' Lodge with the committee of Local 4666 concerning a return to work by the die sinkers, were met by a mass of pickets of Local 4666 who resisted entry.

11. Windows of the employer's plant were boarded during early weeks of the work stoppage, tires of management employees entering the plant were damaged or punctured, and security guards were stationed in the employer's plant during night time hours.

12. During the course of the work stoppage management employees entered and left the employer's plant without substantial difficulty except for an occasion in November of 1975 when pickets massed at the employer's plant and management employees met off the premises and proceeded as a group through the picket lines and to the employer's plant, there having been at that time the arrest of approximately eight pickets by Sheriff's deputies.

13. The entry and departure of trucks to and from the employer's plant met with resistance by the pickets, a truck of the employer having been damaged, and common carriers were followed from the employer's plant by a representative of the employer, members of the striking union having on one occasion followed a truck from the employer's plant until the truck entered an interstate highway.

. . . .

15. Certain fringe benefits in the collective bargaining agreement between the employer and the collective bargaining representative of the die sinkers were historically consistent with like provisions of the collective bargaining agreement between the employer and Local 4666 which represented the production and maintenance employees.

16. Prior to the commencement of the work stoppage by members of Local 4666 on September 2, 1975 and in anticipation thereof members of that local verbally abused certain die sinkers in the employer's plant and threatened that they would get their heads 'bashed in' if they entered the plant.

17. By letter of October 3, 1975 the employer advised the representatives of the die sinkers that the presence of Sheriff's deputies would be arranged for shift starting and quitting times if the die sinkers desired to go to work.

18. None of the die sinkers or their representatives responded to the employer with respect to the employer's offer of protection.

19. The die sinkers at the employer's plant are not the same grade or class of workers as the production and maintenance employees.

20. The claimant and his fellow die sinkers did not cross the picket line of the members of Local 4666 because of fear of their personal safety either in entering the employer's plant or in leaving the employer's plant if successful in gaining entry and because of fear for their safety away from the picket lines.

On the above facts, the referee concluded that the respondents, members of IDSC, had proved the presence

of the three conditions necessary to render the bar of subsection 402(d) inapplicable to their claims. The Board adopted the referee's findings of fact and conclusions of law. We affirm the Board.[2]

Our scope of review is to determine whether the Board has committed errors of law and whether the Board's findings as adopted from the referee are supported by substantial evidence. Questions of credibility and the weight to be given evidence are for the Board. *Shira v. Unemployment Compensation Board of Review*, 10 Pa. Commonwealth Ct. 457, 310 A.2d 708 (1973).

This Court has held that:

All persons who are unemployed due to labor disputes are declared ineligible for benefits unless they can show that they meet [all] three conditions in the proviso to section 402(d). Thus, in order to avoid being disqualified by section 402(d) of the Act, the claimants . . . had the burden of proving (1) that they did not participate in or become directly interested in the labor dispute; (2) that they were not members of an organization which participated in, or was directly interested in, the labor dispute; and (3) that they did not belong to the same grade or class of workers which participated in, or was directly interested in, the labor dispute. See Oluschak Unemployment Compensation Case, 192 Pa. Superior Ct. 255, 159 A.2d 750 (1960); Oliver Unemployment Compensation Case, 189 Pa. Superior Ct. 362, 150 A.2d 361 (1959).

*Unemployment Compensation Board of Review v. Tickle,* 19 Pa. Commonwealth Ct. 550, 560-61, 339 A.2d

---

[2] Lakeview has filed a separate appeal in the case of each of the nine respondents. We consolidated these appeals for argument and disposition.

864, 869-70 (1975); *See also Stahlman Unemployment Compensation Case,* 187 Pa. Superior Ct. 246, 144 A.2d 670 (1958); *Curcio Unemployment Compensation Case,* 165 Pa. Superior Ct. 385, 68 A.2d 393 (1949).

Lakeview says that the respondents were directly interested in the strike of the Steelworkers as evidenced by their refusal to cross the picket line. On this issue we have held in *Unemployment Compensation Board of Review v. G. C. Murphy Co.,* 19 Pa. Commonwealth Ct. 572, 578, 339 A.2d 167, 171 (1975) that:

> [W]orkers not participating in a labor dispute who refuse to cross a picket line due to a reasonable and genuine fear of physical injury inspired by actual or threatened violence are eligible for unemployment compensation.

Lakeview apparently does not challenge the referee's findings that the picketing Steelworkers had on occasion possessed clubs, sticks and ice picks, or that they threatened "to 'crack the skulls' of any die sinker who would attempt to enter the employer's plant'' or that they in fact physically denied some IDSC workers admission to their place of employment. Nor does it challenge other findings of the referee tending to show that the picketing was not peaceful. It argues, rather, that the record as a whole does not justify the referee's finding that the respondents did not cross the picket line because of a reasonable fear for their personal safety. We do not agree. The record amply supports the referee's finding that the respondents were in fact fearful of their safety if they tried to cross the lines and his conclusion that this fear was reasonable. *See Unemployment Compensation Board of Review v. G. C. Murphy Co., supra; Unemployment Compensation Board of Review v. Tickle, supra.*

Lakeview also contends that the respondents were members of an organization which was directly interested in the labor dispute between Lakeview and the

steelworkers. Lakeview recites the facts on which it depends in this regard, as follows:

Despite the fact the IDSC Collective Bargaining Agreement expired first, it was customary for the IDSC members to continue work without a contract until after the USW and the Employer settled their contract. In this way, the Employer could give a small IDSC unit a large wage increase without great costs and without affecting the cost of the larger bargaining unit.

On August 12, 1975, the only pre-strike bargaining session was held between the IDSC and the Employer. At that session, the IDSC made its initial demands. These demands were made at a time when the Employer and USW were still negotiating their Collective Bargaining Agreement.

The IDSC demands included:

Whatever pension improvements the USW and the Employer might eventually agree upon.

The same hospital and surgical improvements the USW and Employer might agree upon.

Ten ($10.00) Dollars more a week in sickness and accident pay than the USW eventually might get in order to maintain the existing Ten ($10.00) Dollars a a week spread.

Whatever holidays the USW won.

Lakeview cites in support of its position the cases of *Unemployment Compensation Board of Review v. Fox Grocery Co.*, 25 Pa. Commonwealth Ct. 494, 360 A.2d 248 (1976); *Stahlman Unemployment Compensation Case, supra,* and *Byerly Unemployment Compensation Case,* 171 Pa. Superior Ct. 303, 90 A.2d 322 (1952). Neither the facts nor cases cited aid Lakeview's cause.

Obviously, Lakeview's willingness to conclude negotiations with the Steelworkers before negotiating with IDSC should have no bearing on the eligibility for unemployment compensation benefits of IDSC members unable to work because of the Steelworkers' activities on the picket line. *Cf. Stahlman Unemployment Compensation Case, supra.* Nor should IDSC's request that some of the benefits provided by its contract be like those obtained by the Steelworkers be taken as proof that IDSC was an organization directly interested in the Steelworkers' strike. First, there is nothing in the record suggesting that IDSC had a relationship of mutual interest with the Steelworkers; and indeed there is considerable evidence that the Steelworkers harbored feelings of active hostility towards IDSC members. Second, IDSC and the Steelworkers are separate bargaining entities negotiating for separate contracts with Lakeview. IDSC's success in securing its demands, while affected perhaps by the Steelworkers' bargaining, finally depended upon the independent skills of its negotiators. It is precisely this point which distinguishes the present case from *Stahlman Unemployment Compensation Case, supra.* There, the Superior Court held that three non-striking unions were directly interested in a labor dispute between a striking fourth union and the employer where all four unions were members of a so-called Joint Council of Unions which negotiated a single labor agreement with an association of employers of which the employer was a member.

*Byerly Unemployment Compensation Case, supra,* is also clearly different. There, unemployment compensation claimants employed by the Westinghouse Electric Corporation and members of Local 601 of the United Electrical, Radio & Machine Workers of America (UE Local 601) were deemed directly interested in the labor dispute between Westinghouse and striking

employees having TF-49 job classifications and who were represented by UE Local 601. The court there wrote:

> Claimants . . . were members of UE Local 601, an organization which, while it did not call the strike of TF-49, undoubtedly had a direct interest in the labor dispute, as evidenced by circulars issued by Porter Mechling, its president, urging the members to respond to the appeal of the foundry workers 'for all out physical and financial support from every section of the Westinghouse plant' and 'Unite behind TF-49. . . .'

*Byerly Unemployment Compensation Case, supra,* 171 Pa. Superior Ct. at 311, 90 A.2d at 326-27.

In the present case the claimants are neither represented by the striking Steelworkers' union nor did their union, IDSC, support the Steelworkers' strike.

*Unemployment Compensation Board of Review v. Fox Grocery Co., supra,* is similarly distinguishable. There non-striking members of a local union were held ineligible for unemployment compensation benefits where their unemployment was caused by a labor dispute between a bargaining unit of their own local and the employer. We there reasoned that, under Section 402(d)(2), the claimants were members "of an organization which was participating in, or directly interested in, the labor dispute which caused the stoppage of work. . . ."

Accordingly, we enter the following:

### Order

And Now, this 21st day of June, 1978, it is ordered that the decisions of the Unemployment Compensation Board of Review be and are hereby affirmed and the petitions for review filed by Lakeview Forge Company to docket numbers 316 C.D. 1977, 684 C.D. 1977, 685 C.D. 1977, 686 C.D. 1977, 687 C.D. 1977, 688 C.D. 1977,

689 C.D. 1977, 690 C.D. 1977 and 691 C.D. 1977 be and are hereby dismissed.

Judge MENCER dissents.