**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Petitioner,**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 6, 1997.

Decided May 22, 1997.

J. Freedley Hunsicker, Jr., Philadelphia, for petitioner.

Linda S. Lloyd, Assistant Counsel, for respondent.

William L. Myers, Jr., Philadelphia, for intervenor, Richard Lechette.

Before FRIEDMAN and LEADBETTER, JJ., and LORD, Senior Judge.

LEADBETTER, Judge.

The Southeastern Pennsylvania Transportation Authority ("SEPTA" or "Employer") appeals from a decision of the Unemployment Compensation Board of Review ("Board") granting unemployment benefits to Richard J. Lechette, et al. ("Claimant"), a member of the United Transportation Union Local 1594. At issue is whether Claimant was entitled to unemployment benefits where Employer refused to continue employment of Claimant under the terms of their expired contract during ongoing contract negotiations while, at the same time, the Transportation Workers Union Local 234 held a work stoppage strike against Employer. The statutory provision at issue is § 402(d) of the Unemployment Compensation Law, Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(d)

("Law" or " § 402(d)"). Section 402(d) provides:

An employee shall be ineligible for compensation for any week—

(d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed: Provided, That this subsection shall not apply if it is shown that (1) he is not participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (2) he is not a member of an organization which is participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (3) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in, or directly interested in, the dispute.

43 P.S. § 802(d).

*Facts*

Claimant is a member of the United Transportation Union Local 1594 ("UTU") which represents the operating employees of SEPTA's Suburban Transit Division. Operating employees include bus operators, starters, clerks, conductors, trolley operators and high speed line operators. Claimant is not a member of the Transportation Workers Union Local 234 ("TWU") which represents the maintenance employees of SEPTA's Suburban Transit Division. Maintenance employees maintain and repair the buses, trolleys, high speed lines, rights of way, electrical system, buildings and bridges in the Suburban Transit Division.

The UTU and the TWU do not conduct *joint contract negotiations, nor do they share*

a collective bargaining agreement. Each union separately negotiates contracts with SEPTA. Historically, negotiations between the TWU and SEPTA have been concluded prior to the conclusion of negotiations between the UTU and SEPTA, and the UTU then has negotiated contracts which mirrored the wage increases obtained by the TWU.

As of April 1, 1995, both the UTU and the TWU were separately negotiating contracts with Employer. The UTU's contract was scheduled to expire as of 12:01 a.m. on April 2, 1995. On April 1, 1995, prior to the expiration of the contract, the UTU offered to continue work under the terms and conditions of the preexisting contract while negotiations continued. Employer, in a letter dated April 1, 1995, rejected the UTU's offer and stated that UTU members, like Claimant, would be allowed to work only if the UTU agreed to several conditions.[1] Also on April 1, 1995, the TWU told Employer that they planned to go out on strike as of 12:01 a.m. on April 2, 1995. In a letter dated April 2, 1995, Employer informed the UTU (1) that no work was available to UTU members due to the TWU's strike and (2) that "the Contract and all of its provisions, terms and conditions, including all the work rules and practices previously agreed to, terminated as of midnight April 1, 1995".[2]

From April 2, 1995 through April 9, 1995, all UTU members were prohibited from working. On April 10, 1995 the TWU and SEPTA reached an agreement and the TWU ended its strike. Also on April 10, 1995, Claimant and the other UTU members returned to work. The UTU members returned to work under the terms of the preexisting contract and without any new agreement. They continued to work without a formal contract for several months, and no work stoppages occurred at SEPTA's Suburban Transit Division subsequent to April 10,

---

**1.** [Y]ou will not be allowed to resume work under the wage and benefit provisions, of the expired collective bargaining Agreement, *unless* the Union agrees that all of the working conditions, including all the work rules and practices, terminate and are no longer in effect and agrees to work pursuant to the working conditions set forth in the Authority's last proposal. . . .

April 1, 1995 letter from the Chief Labor Relations Officer at SEPTA to the General Chairman of the UTU. (R.R. 92a).

**2.** April 2, 1995 letter from the Chief Labor Relations Officer at SEPTA to the General Chairman of the UTU. (R.R. 81a).

1995. On November 3, 1995, SEPTA and the UTU reached a formal agreement.

*History*

In the late Spring of 1995, Claimant filed for unemployment compensation for the period of April 2, 1995 through April 9, 1995. In July of 1995, the Department of Labor and Industry found that SEPTA's letters to the UTU on April 1, 1995 and April 2, 1995 amounted to a lock-out, such that Claimant was not disqualified for unemployment compensation under § 402(d). In August of 1995, SEPTA appealed this finding. This appeal was heard in December of 1995, and the decision of the Department of Labor and Industry was upheld in its entirety by the referee in his decision of January 31, 1996. SEPTA appealed this decision to the Board and, in its decision of March 29, 1996, the Board agreed that Claimant was entitled to unemployment compensation for the April 1995 work stoppage. The Board found that the April 1995 work stoppage was the result of a labor dispute rather than a lock-out, but that Claimant had satisfied the § 402(d) conditions, and thus was qualified to receive compensation. It is this March 1996 decision of the Board which is now before this court upon SEPTA's Petition for Review. For the reasons stated below, we affirm.

*Lock-out or Strike*

Although both SEPTA and the Board agree that the April 1995 work stoppage was the result of a labor dispute, Claimant, as intervenor, urges us to affirm the Board's decision on a different ground, i.e., the referee's conclusion that the work stoppage was the result of a lock-out by SEPTA.

■ The determination of whether a stoppage is the result of a lock-out or a labor dispute is based upon the "maintenance of the status quo" test enunciated in *Vrotney Unemployment Compensation Case*, 400 Pa. 440, 163 A.2d 91 (1960). Under that test, if the employees have "offered to continue working for a reasonable time under the pre-existing terms and conditions of employment" and the employer "refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lock-out'." *Vrotney*, 400 Pa. at 444–5, 163 A.2d at 94. In *Philco Corp. v.*

*Unemployment Compensation Bd. of Review*, 430 Pa. 101, 242 A.2d 454 (1968), the Pennsylvania Supreme Court clarified the *Vrotney* test, holding that the test requires that a determination be made as to "which side, union or management, first refused to continue operations under the status quo *after the contract had technically expired*, but while negotiations were continuing." *Id.* at 103, 242 A.2d at 455 (emphasis added).

■ Applying this test to the matter now before the court, it is clear that the Board did not err in finding that the April 1995 work stoppage was the result of a labor dispute rather than a lockout. Although Claimant contends that SEPTA's April 1, 1995 letter constitutes a refusal to continue with the status quo and was a lock-out of the UTU members, that letter was sent out and received *prior* to the expiration of the UTU contract. Thus, the April 1 letter cannot be deemed a lockout under the Vrotney/Philco standards. Essentially, while the old contract was still in effect, the UTU and SEPTA were negotiating the terms under which UTU members would continue to work between the original contract's expiration and the agreement upon terms for a new contract. After an offer and counter-offer had been made, these negotiations were rendered moot by the TWU strike. After the expiration of the contract, SEPTA did not repeat the threats of the April 1, 1995 letter. Instead, SEPTA notified the UTU that the TWU strike had rendered services inoperable, such that no work was available to the UTU members. The Board found that it was the TWU strike which prohibited Claimant and the other UTU members from returning to work, and there is substantial evidence in the record below to support this finding. Accordingly, the April 1995 work stoppage was due to a labor dispute and Claimant is entitled to unemployment compensation only if he can satisfy the three conditions set forth in § 402(d).

*Direct Interest*

The first two elements which claimant must establish under § 402(d) are that neither he nor the UTU was directly interested

in the TWU strike. In support of the Board's finding that Claimant met this burden, claimant and the Board rely primarily on the fact that the UTU and the TWU are separate unions which negotiate separate contracts with the Employer. SEPTA alleges that, even though the UTU and the TWU are separate unions which separately negotiate their contracts, both Claimant and the UTU were directly interested in the TWU strike because the members of the UTU stood to receive the same, or similar, concessions as those obtained by the strikers. These allegations are not supported by law or fact. Although the UTU may have mirrored its demands upon those of the TWU, the UTU conducted separate negotiations which resulted in a contract distinct from that of the TWU.[3] The Board found it significant that the UTU never had any guarantee that it could obtain the contract terms acquired by the TWU. Moreover, the work condition concerns of the UTU were different from those of the TWU. In *Lakeview Forge Co. v. Unemployment Compensation Bd. of Review*, 36 Pa.Cmwlth. 204, 387 A.2d 984 (1978), this court found that there was no direct interest where, as in this case, a second union mirrored the bargaining of a first union but conducted its own, separate negotiations. Finally, perhaps the most telling sign of UTU's independence is that although the TWU contract agreement was reached on April 10, the negotiations between SEPTA and UTU continued until November.

SEPTA attempts to analogize the current matter to *Kearney v. Unemployment Compensation Bd. of Review*, 89 Pa.Cmwlth. 404, 492 A.2d 790 (1985) and *Dravo Corp. v. Unemployment Compensation Bd. of Review*,

187 Pa. Superior Ct. 246, 144 A.2d 670 (1958), two cases in which a direct interest was found. However, both of these cases are easily distinguishable. In *Kearney* and *Dravo*, the Board found a direct interest where the striking union was negotiating a collective bargaining agreement which would apply to workers in both the striking and the nonstriking unions. Here, quite to the contrary, the TWU and UTU negotiated separately with SEPTA. If the Claimant and the UTU were interested in the TWU strike, it was at most an *indirect* interest rather than the *direct* interest required by § 402(d).

■ SEPTA also relies on *Byerly v. Unemployment Compensation Board of Review*, 171 Pa. Superior Ct. 303, 90 A.2d 322 (1952) for the proposition that by showing support for a striking union, a nonstriking union can be directly interested in the strike. However, in *Byerly*, the members of the non-striking union actively showed support for the strikers through distributing pro-strike circulars, whereas here the only support that SEPTA alleges is the fact that the UTU had previously mirrored its bargaining upon that of the TWU. This is simply insufficient to show a direct interest.

### Same Grade or Class

Next, claimant must show that he is not of the same grade or class as the striking TWU workers. The standards applicable to the evaluation of this requirement are not altogether well-defined.[4] Historically, a variety of tests have been applied to the determination of whether workers are of the same grade or class.[5] Although the general policy behind § 402(d) is to provide compensation

---

3. The TWU signed a contract with SEPTA in April, 1995. The UTU did not have a finalized contract with SEPTA until November, 1995.

4. In fact, sometimes these standards are not articulated at all. The Board below relied on such a case, *Unemployment Compensation Bd. of Review v. Tickle*, 19 Pa.Cmwlth. 550, 339 A.2d 864 (1975), as controlling. In *Tickle*, this court, without explanation, held that it was "obvious that ... garagemen and mechanics are a different grade or class of workers than ... truck drivers." *Id.* at 870 n. 2. Because *Tickle* fails to provide any guidance as to how it analyzed the grade or class requirement, it is impossible to determine

whether it has survived our Supreme Court's enunciation of new standards in *Renne v. Unemployment Compensation Bd. of Review*, 499 Pa. 299, 453 A.2d 318 (1982).

5. For example, all of the following have been used to find that workers were of the same grade or class: union membership, similarity of work performed, work at same plant or establishment, bargaining unit, and line of production. Frank J. Vecella, Comment, *Grade or Class Provision as a Basis for Disqualification for Unemployment Compensation—Bethlehem Steel Co. v. Board*, 20 Md. L.Rev. 59, 61 (1960).

for those involuntarily unemployed, each of these various tests, when applied, can define the grade or class provision so arbitrarily as to have no rational relationship to the line between those voluntarily and involuntarily unemployed. The grade or class provision has been criticized:

> variously as a "dragnet provision," as creating "a broad area of guilt by association," and as one of "the most remarkable principles of vicarious guilt found in the law." Each of these criticisms is directed to the fact that the grade or class provision in no way distinguishes between voluntary and involuntary unemployment, which is the essence of the Unemployment Compensation Law.

Sydney Reuben & Daniel R. Schuckers, *The Labor Dispute Disqualification in Pennsylvania Unemployment Compensation Law,* 51 Temp. L.Q. 211, 246 (1977) (citations omitted).

Prior to *Renne v. Unemployment Compensation Bd. of Review,* 499 Pa. 299, 453 A.2d 318 (1982), Pennsylvania courts relied primarily upon the function or "line of production" test. The function test has been used to equate a worker's grade or class to the industry in which he was employed, rather than to his pay and duties. *See, e.g., Dravo Corp. v. Unemployment Compensation Bd. of Review,* 187 Pa. Superior Ct. 246, 144 A.2d 670 (1958).[6]

The function test, as with the grade or class provision generally, makes sense only in a factual context which does not exist today. When the grade or class provision was drafted, craft unions dominated labor relations and industrial unions were barely known. Although craft unions seldom cooperated with one another, they could, and often successfully did so with a "key man strike". In a key man strike, an entire production line could be shut down by the strike of only one craft union. The other unions on

the line could claim no involvement and could contribute to the striking union's strike fund.[7] The grade or class provision of the Law was aimed at limiting the key man strike by prohibiting the non-striking workers from collecting benefits which could be passed on to the strikers, in other words to prevent collusion where direct interest was not apparent. However, starting in the mid-1930s, the labor landscape began to change. Industry-wide or industrial unions largely replaced craft unions. As they developed across entire industries, these industrial unions relied on massive sit-down strikes rather than targeted key man strikes in their labor disputes. Moreover, as the craft unions declined, key man strikes became more and more uncommon as only rarely did more than a one union represent the workers on a single production line. With this virtual elimination of craft unions and the key man strike, the "grade or class" language as originally intended and understood, as well as the function test, bears no logical relation to the original purpose of the provision—to prevent sister unions from engaging in collusion to accomplish indirectly that which they could not do directly.

In *Renne v. Unemployment Compensation Bd. of Review,* 499 Pa. 299, 305, 453 A.2d 318, 321 (1982), the Pennsylvania Supreme Court recognized that the function test could lead to arbitrary and sometimes harsh results. The court held that substitute teachers were not of the same grade or class as full time teachers. In support of this holding, the court pointed out that substitute teachers receive substantially different pay and benefits than do full-time teachers, that they do not belong to the same collective bargaining unit as the full-time teachers, and that their employment is governed by a contract separate and distinct from the contract governing the employment of full-time teachers. *Id.* at 306, 453 A.2d at 321–22. The Supreme

---

**6.** In *Dravo Corp.,* the Superior Court held that carpenters, operating engineers, truck drivers and general laborers were of the same grade or class since "all of the claimants, regardless of differences in their duties, were production workers in the heavy construction business of their employer and they therefore were of the same class as the striking members of the labor-

ers' union who clearly also were construction workers."

**7.** Thomas P. McCormick, Comment, *Unemployment Compensation—An Examination of Wisconsin's "Active Progress" Labor Dispute Disqualification Provision,* 1982 Wis. L.Rev. 907, 934 (1982).

Court then went on to enunciate a new test for the grade or class provision:

> the totality of the circumstances surrounding the employment of an applicant for unemployment compensation benefits must be considered when interpreting the words "grade or class" as used in § 402(d). Factors of employment must be examined, including salary, benefits, working conditions, hours, job security, skills, training, job rank and employment contracts.

*Id.* at 307, 453 A.2d at 322. Although *Renne* eliminated the arbitrariness of the function test, the "totality of the circumstances" test provides few concrete guidelines.

■ However, viewing *Renne* in the context of the historical and remedial purposes of § 402(d), it is clear that non-striking workers are of the same "grade or class" as striking workers if circumstances exist which negate the presumption of independence among separate unions where each is negotiating its own collective bargaining agreement. Such circumstances might be found, for instance, if the non-striking union or its members provide support or assistance to the striking union and/or its members, or if the factors outlined in *Renne* are so closely mirrored between the striking and non-striking unions that having made a bargain with one, the employer must inevitably strike essentially the same bargain with the other, or if, promptly after having negotiated the first agreement, the employer in fact does strike essentially the same bargain with the non-striking union. There are no such circumstances in the present case sufficient to negate the presumption of independence on the part of the UTU.

In conclusion, the purpose of § 402(d) was to provide compensation for non-striking employees who lost work because of a strike by a different union over which they had no control, but to deny compensation where the strike was reasonably calculated to inure to the benefit of those non-striking workers.

Such benefit is obvious where, under the first two prongs of § 402(d), a direct interest of the worker or his non-striking union is shown. Such a benefit may also be shown under the third "class or grade" prong by proof of factors [8] which negate the presumption of independence and demonstrate a substantial actual, albeit indirect, interest.

Under the circumstances presented here, the Board did not err in holding that claimant was entitled to benefits under § 402(d), and we affirm.

### ORDER

AND NOW, this 22nd day of May, 1997, the order of the Unemployment Compensation Board of Review of March 29, 1996 in the above-captioned matter is affirmed.

---

8. On appeal SEPTA also complains of the exclusion of its proffered evidence of historical similarities between contracts negotiated by UTU and TWU. We agree that such evidence could be relevant to the issue of whether the unions are acting independently or whether the action of one is calculated to inure to the benefit of the other(s). Under the facts of this case, however, particularly the extended nature of SEPTA's negotiations with the UTU after the TWU agreement was reached, we believe that the evidence of independence was sufficiently clear as to render harmless any error in excluding evidence of "patterned bargaining."